# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 03-1491

WALENTYNA KORNIEJEW,

*Petitioner*,

v.

JOHN D. ASHCROFT,

*Respondent.*

———————

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A76-456-673

———————

ARGUED DECEMBER 2, 2003—DECIDED JUNE 14, 2004

———————

Before RIPPLE, MANION and DIANE P. WOOD, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Petitioner Walentyna Korniejew seeks review of an adverse decision of the Board of Immigration Appeals (the "BIA" or "Board") that denied her request for asylum. For the reasons set forth in the following opinion, we deny the petition and affirm the decision of the BIA.

# I

# BACKGROUND

## A. Facts

Ms. Korniejew was born in the village of Dawidowicze, Poland, on January 14, 1961. Ms. Korniejew's mother was Jewish, and her family practiced its Jewish faith in secret. Ms. Korniejew's parents kept their daughter's faith hidden so that Ms. Korniejew could attend school and college without encountering the same hostility as other Jewish students.

At the time Ms. Korniejew graduated from college, about 1980,[1] the Polish government began renovating some of the synagogues that had been destroyed in World War II or that otherwise had fallen into disrepair. Ms. Korniejew and a number of the Jewish residents of her village decided to visit the synagogue at Tykocin and to try to hold services there. When they arrived, however, they found the synagogue closed. Authorities ordered Ms. Korniejew's group to report to the local police precinct; there they were told that the synagogue was only a museum, not a place of worship. They also were warned, on pain of imprisonment, not to attempt to hold services there in the future. The group then was fingerprinted and released.

On the road home from Tykocin, a small group of people on the side of the road signaled for the bus to stop. Two individuals boarded the bus; one of them pulled a gun, and the other drove the bus to a neighboring village. The

---

[1] Ms. Korniejew's affidavit attached to her asylum application states that she graduated from college. However, in her testimony, she maintains that she was expelled from college when the dean discovered she was Jewish. *Compare* A.R. 268 (affidavit) *with* A.R. 177-78 (testimony).

hijackers drove the bus to a large barn where another man, wearing black and bearing a swastika on his arm, boarded the vehicle. The man threatened the group and told them that they should not attempt to visit the synagogue again. The hijackers then took the bus back to the main road.

Later, in 1986, another group attempted a similar trip to the Nozyk Synagogue in Warsaw to celebrate Rosh Hashanah. The group did not experience any problems until the return trip. In her asylum affidavit, Ms. Korniejew recounted that the following events occurred on their return trip from Warsaw:

> After about 10 km from the city limits our bus was stopped by the police car. The policeman checked the ID of our driver and asked him to give a lift to two people. . . . After just a few minutes those two people stood up and pointed guns at the driver and at us. The driver was ordered to sit in the front row and one of the attackers took the driver's seat . . . .
>
>    . . . The attackers asked who was the leader of our group. None of us answered. Then they pointed towards two of our older people Lesczynski and Kozlowski and ordered them to leave the bus. After they refused to leave it they shot Kozlowski, Lesczynski went towards the door and left the bus.[2] In about 30 minutes he returned brutally beaten.
>
>    After that the attackers ordered me and Natalie Siemieniuk to leave the bus. We stepped out of the bus and they took us to the neighboring house. The group of people waiting for us in the house was in black uniforms with swastikas on their arms . . . . Two of them

---

[2] In her hearing testimony, Ms. Korniejew stated: "I think Kozlowski was shot. I don't remember for sure. But the other one they pushed out." A.R. 185.

> grabbed me and pushed into the room, where he fol-
> lowed me. There he brutally raped me. In the other
> room the same thing happened to Natalie. After they
> finished torturing us they returned us back to the bus.

A.R. 270-71. Ms. Korniejew suffered a great deal from her ordeal and could not go back to work until September 1987. The local Jewish community attempted no future trips; the Jewish families continued to gather in homes or at a local Jewish cemetery.

In the middle of 1988, the construction firm for which Ms. Korniejew worked was hired to build a development of homes on part of the Jewish cemetery where Ms. Korniejew and others worshiped. The group of worshipers was advised by local authorities that, if they wished to stop the project, they must file a written protest. They did so in January 1989.

In February 1989, individuals who signed the protest received threatening notes vowing revenge if the complaint were not withdrawn. The company for which Ms. Korniejew worked discovered that she had participated in the protest and terminated her employment. Ms. Korniejew then complained twice to the Attorney General of Poland regarding the development; in her last complaint, she included a statement regarding "the ignorance of local and State authorities." A.R. 272.

In March 1989, Ms. Korniejew was kidnapped by "skin-heads" who threatened to kill her if the complaints to the Attorney General were not withdrawn. She agreed to accede to their demands. They kept her overnight and threatened to kill her family if she "cheat[ed] them." *Id.*[3]

---

[3] In her testimony before the Immigration Judge, Ms. Korniejew failed to mention this event. She stated that she "[m]aybe . . . (continued...)

Ms. Korniejew stated that, after this last event, she and her husband were very scared and moved to her grandparents' house. They stayed with her grandparents until Ms. Korniejew left for the United States in April 1989.[4] According to Ms. Korniejew, her parents would visit her former apartment and "for more than half a year were taking threats from our mailbox." A.R. 272. After another six months, Ms. Korniejew's husband moved back to the apartment; however, he left their daughter in the care of Ms. Korniejew's grandparents.

Between 1992 and 1995, several members of the group who had protested the cemetery development mysteriously disappeared. Then, in January 1997, Ms. Korniejew's husband unexpectedly disappeared. *See id.* at 273.[5] His body never was found, and, as of the time of Ms. Korniejew's removal hearing, the case of his disappearance remained open.

---

[3] (...continued)
forgot to mention it. Because it was a lot of years ago." A.R. 210. When counsel for the Government pointed out that this was the most recent event, she stated that "[w]ell, I mean they kept me overnight but they didn't do all that much to me. I mean they, they beat me up a little." *Id.* Finally, she stated that "my attorney didn't ask me about it." *Id.*

[4] Ms. Korniejew was admitted as a visitor for a period of no more than six months.

[5] Ms. Korniejew testified that her husband disappeared on December 30 or 31, 1996. The "death certificate" presented at Ms. Korniejew's hearing stated that he disappeared on December 30, 1996.

### B. Administrative Proceedings

As noted above, Ms. Korniejew entered the United States with a visitor's visa on April 30, 1989. She filed an application for asylum on October 22, 1997. Shortly thereafter, on January 12, 1998, the Immigration and Naturalization Service[6] issued a Notice to Appear, and a removal hearing was held on November 19, 1998.

At her hearing, Ms. Korniejew admitted that she was removable, but sought asylum and withholding of removal. The Immigration Judge ("IJ") denied the requested relief, but granted her voluntary departure. Specifically, the IJ found that her testimony lacked credibility based upon several discrepancies between her affidavit and her testimony. First, the IJ noted that Ms. Korniejew had testified that she was expelled from college; however, she had stated in her affidavit that she graduated from college. The IJ also found a discrepancy regarding the events of October 1986; the IJ noted that Ms. Korniejew had testified that "two members of her party were taken off the bus by skinheads and shot. Her affidavit indicates, however, that one of them (Kozlowski) was shot after he refused to get off the bus." A.R. 152.

The IJ also was influenced by other shortcomings in Ms. Korniejew's presentation of her case: (1) Ms. Korniejew's affidavit indicated that she protested the construction in January 1989 and "began receiving threats in February, whereas she testified that she received threats for six

---

[6] Recently, the Immigration and Naturalization Service was abolished, and its immigration enforcement function was transferred to the Bureau of Immigration and Customs Enforcement in the newly created Department of Homeland Security. *See Gonzalez v. O'Connell*, 355 F.3d 1010, 1011 n.1 (7th Cir. 2004).

months after filing the protest (which would not have been possible given that she came to the U.S. in April 1989)," A.R. 152; (2) Ms. Korniejew failed to testify to a 1989 kidnapping that she had mentioned in her asylum application; (3) Ms. Korniejew did not provide a satisfactory explanation for why she waited eight years to file an asylum application; and (4) not one of the incidents recounted by Ms. Korniejew was supported by documentation. The only exception to this lack of corroboration was the letter from the police regarding her husband's "death" which the court found to be of little probative value

> because it is not an official record and does not indicate any circumstances behind his alleged disappearance or the cause of death. Moreover, according to its contents the death was reported on December 30, 1986, which is a day before, according to the respondent's testimony, he allegedly disappeared.

A.R. 154.

The BIA affirmed the judgment of the IJ. It stated first that it

> will generally defer to an Immigration Judge's adverse credibility findings that are based on inconsistencies and omissions that are central to the claim where (1) the discrepancies and omissions are actually present in the record; (2) the discrepancies and omissions provide specific and cogent reasons for the adverse credibility finding; and (3) the alien has not provided a convincing explanation for the discrepancies and omissions.

A.R. 4. The BIA then determined that, based on its own review of the record, there were "material inconsistencies between her asylum application and testimony." *Id.* Specifically, the BIA pointed to the fact that Ms. Korniejew testified that she was forced to leave the university because

she was Jewish; in her asylum application, however, Ms. Korniejew stated that she graduated from the university. The BIA also mentioned the fact that Ms. Korniejew failed to testify during her hearing that she was kidnapped in March 1989. Finally, the BIA noted that Ms. Korniejew testified that

> she began receiving threats 6 months after she filed a protest against the construction of homes on a Jewish cemetery. According to her application, her protest was filed in January 1989. Inasmuch as she entered the United States in April 1989, we agree with the Immigration Judge that these two statements are ir-reconcilable.

*Id.* at 5 (citation omitted). Based on these examples, and the others set forth in the IJ's opinion, the BIA was "unable to find that the Immigration Judge incorrectly decided the issues at the hearing," *id.*, and therefore affirmed the IJ's decision.

# II

## ANALYSIS

### A.  Standard of Review

This court's review of a BIA decision is limited.[7] This court must uphold the BIA's determination if it is supported by "reasonable, substantial, and probative evidence on the record considered as a whole." *Toptchev v. INS*, 295 F.3d 714, 720 (7th Cir. 2002) (internal quotation marks and citations

---

[7] Because the BIA conducted an independent review of the record and did not rely exclusively on the IJ's findings, we review the BIA's decision and not that of the IJ. *See Vongsakdy v. INS*, 171 F.3d 1203, 1206 (9th Cir. 1999).

omitted). Stated slightly differently, this court must affirm unless the evidence compels a different result. *See Ciorba v. Ashcroft*, 323 F.3d 539, 544 (7th Cir. 2003).

Furthermore, this court has recognized that "[c]redibility determinations are accorded substantial deference" and "should only be overturned under extraordinary circumstances." *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999) (internal quotation marks and citations omitted). However, "they must be supported by specific, cogent reasons." *Id.* "In addition, these reasons must bear a legitimate nexus to the finding." *Id.* (internal quotation marks and citations omitted).

## B. Asylum

Ms. Korniejew maintains that her testimony before the IJ established that she had suffered past persecution in Poland. This testimony, she continues, was credible. She argues that the inconsistencies cited by the IJ and the BIA are either illusory or negligible, and, therefore, they cannot form the basis of an adverse credibility determination.

It is well-established that the credible testimony of an alien, without more, *may* be sufficient to sustain an asylum claim. *See Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004); *see also* 8 C.F.R. § 208.13(a) ("The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."). "However, if the IJ finds the testimony to be incredible, then a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence is required." *Capric*, 355 F.3d at 1086.

On review, it is not the province of this court to " 'second guess th[e] . . . factual findings and credibility determinations' " made by the IJ or the BIA. *See Mansour v. INS*, 230

F.3d 902, 906 (7th Cir. 2000) (quoting *Karpetian v. INS*, 162 F.3d 933, 936 (7th Cir. 1998)). However, we shall not "automatically yield" to the agency's conclusions. *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003). "[C]redibility determinations . . . must be supported by 'specific, cogent reasons.' In addition, these reasons must 'bear a legitimate nexus to the finding.' " *Ahmad v. INS*, 163 F.3d 457, 461 (7th Cir. 1999) (quoting *Nasseri v. Moschorak*, 34 F.3d 723, 726 (9th Cir. 1994), *overruled on other grounds by Fisher v. INS*, 79 F.3d 955 (9th Cir. 1996)). We shall not defer to credibility determinations "drawn from insufficient or incomplete evidence," *Georgis*, 328 F.3d at 969, nor shall we uphold "[a]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record," *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002).

### 1. Discrepancies in the Evidence

In the present case, the IJ relied on several discrepancies, as well as other shortcomings, in the evidence to deny Ms. Korniejew relief. In its affirmance, the BIA relied specifically on three of the inconsistencies and referenced other aspects of the IJ's decision. Because the BIA conducted its own review of the record, we look to the contradictions and shortcomings on which the BIA relied to determine whether these are sufficient to support the BIA's determination that Ms. Korniejew did not present a credible case for asylum. *See supra* note 7.

### a.

The BIA refers specifically to three discrepancies in Ms. Korniejew's testimony. First, it cites the fact that Ms. Korniejew testified during her hearing that she was expelled

from college; however, she had stated in her affidavit that she graduated. There is no question that the difference in Ms. Korniejew's affidavit and testimony constitutes a discrepancy. Ms. Korniejew acknowledges this shortcoming in the evidence and simply urges this court to disregard all of the evidence concerning her college education. According to Ms. Korniejew, this is a minor inconsistency, and, even without this testimony, she has established past persecution.

We cannot dismiss as inconsequential evidence regarding discrimination in education. Although we have not held explicitly that the denial of a higher education in all situations constitutes persecution, we have suggested that an official policy denying an ethnic or religious minority the right to a higher education could be a form of persecution. See Bucur v. INS, 109 F.3d 399, 403 (7th Cir. 1997) ("If Romania denied its Ukrainian citizens the right to higher education enjoyed by ethnic Romanians, this would be, we imagine, a form of persecution."); id. at 405 ("If a government as part of an official campaign against some religious sect closed all the sect's schools (but no other private schools) and forced their pupils to attend public school, this would be, we should think, although we need not decide, a form of religious persecution."). Nevertheless, we agree with Ms. Korniejew that her allegation that she was expelled from college based on her Jewish faith is not the linchpin of her asylum claim. Consequently, if the BIA's other grounds for upholding the IJ's credibility determination do not survive review, we cannot say that this item, standing alone, can form the basis for an adverse credibility finding.

### b.

In its decision, the BIA also relied upon Ms. Korniejew's failure to testify to the March 1989 kidnapping incident. In

her affidavit, Ms. Korniejew detailed the events leading to her decision to leave for the United States in April 1989. She recounted the threats that she received in February and March 1989, as well as the termination of her employment at the same time. Additionally she stated:

> On March 28, I was kidnapped on my way from the bakery. Skinheads who kidnapped me promised to kill me if our complaints to [the] Attorney General would not be withdrawn. I was scared and promised to do whatever they demanded. They promised to kill my family if I were to cheat them. They kept me overnight and took me back to where they kidnapped me.

A.R. 272. Ms. Korniejew also related that, following this event, "[m]y husband was scared to death and we decided not to risk our lives. We moved to my grandparents' house in Dawidowicze and stayed there till I left for the US at the end of April." *Id.*

Based on Ms. Korniejew's affidavit, the kidnapping event was an important factor in the decision to uproot her family and to leave for the United States. However, during her asylum hearing, Ms. Korniejew failed to mention this occurrence during her direct examination, despite the fact that she was given opportunities to do so.[8] When counsel for the Government confronted Ms. Korniejew with her failure to mention this event, the following colloquy took place:

_____

[8] After describing to the IJ the threats that she had received in February and March 1989, her counsel inquired: "Did anything else happen to you at this time, ma'am?" A.R. 194. Ms. Korniejew replied: "Well after all of this I had come to the United States. This is the end of April in '89." *Id.* Later in the hearing, Ms. Korniejew's counsel invited her to make any additional statements: "Do you have anything else that you'd like to say personally to the Court, ma'am?" *Id.* at 204. Again, Ms. Korniejew made no mention of the 1989 kidnapping.

Q. Why didn't you mention that [the 1989 kidnapping] here today?

A. Maybe I forgot to mention it. Because it was a lot of years ago.

Q. Well 1989 would have been the most recent of something occurring to you there. And your statement says, your statement says that you were kept overnight by skinheads.

A. Well, I mean they kept me overnight but they didn't do all that much to me. I mean they, they beat me up a little. But I very strongly remember that return from Warsaw to Bialystok that incident.

Q. Why wouldn't you tell the Judge today about the most recent incident that occurred to you before you left Poland?

A. Well, my attorney didn't ask me about it.

A.R. 210.

Under these circumstances, we must conclude that Ms. Korniejew's failure to testify to the 1989 kidnapping is significant. This incident represents Ms. Korniejew's most recent personal encounter with those threatening her. It also is the only time that she ever was held overnight. Furthermore, this incident involved physical injury to Ms. Korniejew; she testified during the hearing that she was "beaten up a little" by her abductors. Finally, at least according to Ms. Korniejew's affidavit, the incident contributed to her decision to remove her family from their village and to leave for the United States. We, therefore, cannot fault the BIA for basing its credibility determination in part on Ms. Korniejew's failure to testify to this event.

C.

The BIA also cited Ms. Korniejew's testimony regarding the timing of threats she received as a basis for upholding the IJ's credibility finding. We believe this discrepancy is illusory. Ms. Korniejew did not testify that she began receiving threats six months after she filed the protest, i.e., in July 1989; she stated that "for about six months after filing those papers we were receiving threatening letters." A.R. 193. Thus, her testimony was consistent with her representations in her affidavit that she began receiving threats in February 1989 and those threats continued to be sent to her address after her departure for the United States in April 1989.

### 2. Credibility Determination

The question then becomes whether these two shortcomings in Ms. Korniejew's testimony are sufficient to sustain the adverse credibility finding of the BIA. We faced a similar question in *Georgis v. Ashcroft*, 328 F.3d 962 (7th Cir. 2003). In *Georgis*, the IJ had denied an asylum application on the ground that he did not believe that the testimony of the applicant was credible. In his decision, the IJ listed six instances of inconsistencies or other shortcomings in the applicant's testimony which, in the IJ's opinion, undermined her credibility. Several of these discrepancies involved differences in dates that were attributable to the differences in the Gregorian and Julian calendars, and the Government conceded that these were minor.[9] Consequently, we were left with only two problems cited by the IJ concerning the applicant's testimony: the lack of corrobo-

---

[9] The applicant was from a country that followed the Julian calendar.

ration and the applicant's failure to mention in her asylum application an arrest and beating incurred as a result of participating in a demonstration in 1993.

In *Georgis*, turning to the last two issues, we held that "it was error to exclude documents verifying the petitioner's testimony that [s]he had been arrested and detained for lack of certification when the denial of asylum was based in part on the lack of corroborating evidence." *Id.* at 969 (citing *Khan v. INS*, 237 F.3d 1143, 1144 (9th Cir. 2001)). With respect to the applicant's failure to mention the one incident in her asylum application, we stated:

> The remaining reason why the IJ discredited Georgis's claims was that her asylum application did not mention that she had been arrested and beaten in September 1993 for demonstrating in support of Professor Woldeyes, nor did it mention that her uncle had been killed due to those demonstrations. Specifically, Item 4 of the application asked whether Georgis "or any member of [her] family [had] ever been mistreated/threatened by the authorities." Item 5 then asked if Georgis "or any member of [her] family [had] ever been arrested, detained, interrogated, convicted and sentenced, or imprisoned." While citing other, more recent examples of the persecution of her family members by the Ethiopian government, Georgis did not mention the September 1993 events in response to either of these questions. At her hearing Georgis explained that the reason she did not mention the 1993 arrest in response to Item No. 5 was because she did not believe that "the incident would count as imprisonment. In my mind what imprisonment I thought that it's in the central prison for longer terms and all that. That's why I didn't really mention it." She further explained that she did not bring up the incident in response to Item

> No. 4 because "it is a short term and short time, I thought it was not much relevance for the case . . . . I didn't mention it is because it's a past case. I didn't thought that it's going to help my case. I thought that the current situation that I have, my children's and my husband problem, that's what I emphasized it more than what happened to me."

*Id.* at 969-70. We considered the applicant's explanations "plausible"; however, we recognized "that it is the role of the IJ and not this reviewing court to decide whether her explanation justified her omitting the incident from her asylum application." *Id.* at 970. Nevertheless, "having found that the other five reasons given by the IJ for discrediting Georgis are either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we [we]re not inclined to defer to his credibility determination on this remaining sixth ground alone." *Id.*

Although we are concerned by the lack of attention to the record that the BIA exhibited when it relied upon the timing of the threats as a reason to uphold the IJ's credibility determination, we do not regard the BIA's decision as equivalent to that of the IJ in *Georgis*. In *Georgis*, we discredited five of the six reasons cited by the IJ in support of his credibility determination; in this case, we have discredited only one of three. Additionally, in *Georgis*, the one discrepancy remaining after our review was not an event that immediately had preceded the applicant's decision to come to the United States or to seek asylum, and other "more recent examples of the persecution of her family members by the Ethiopian government" had been cited in the asylum application. *Id.* at 969. By contrast, in the present case, the 1989 kidnapping was the most recent example of harassment. It was the only incident that involved Ms. Korniejew being kept overnight, and it immediately preceded her

departure for the United States. Furthermore, unlike the applicant in *Georgis*, Ms. Korniejew does not offer the same level of explanation as to why she forgot to testify to the 1989 kidnapping, nor does she offer an explanation for the discrepancy in her testimony and application concerning her education. Consequently, we believe that Ms. Korniejew's situation is not analogous to that of the applicant in *Georgis* and that there is sufficient evidence, although certainly not overwhelming, to support the BIA's conclusion that Ms. Korniejew was not credible.

Although we uphold the decision of the BIA in this case, we note the increasing reliance by the BIA and IJs upon *perceived* inconsistencies in testimony and upon lack of corroboration as the basis for adverse credibility determinations. *See Ememe v. Ashcroft*, 2004 WL 253552 (7th Cir. Feb. 12, 2004) (reversing decision of BIA based upon adverse credibility finding when inconsistencies may have been due to limited language skills and no inquiry into proficiency was made); *Uwase v. INS*, 349 F.3d 1039, 1044 (7th Cir. 1992) (granting petition for review when the IJ relied on minor inconsistencies and an unfounded lack of corroboration to deny asylum request); *Georgis*, 328 F.3d at 970 (vacating removal order and remanding for further proceedings where the bases for the IJ's adverse credibility determination were, in large part, undermined). Although it remains the province of the agency to evaluate the credibility of an applicant's evidence, the reason for this deference is that "direct authentication or verification of an alien's testimony and/or evidence is typically very difficult and often impossible." *Capric v. Ashcroft*, 355 F.3d 1075, 1085 (7th Cir. 2004). Indeed, we frequently have acknowledged that it is unreasonable to expect asylum applicants to procure corroborating documents when official records are "in disarray," either because of war, revolution or simply lack of institutional regularity. *Kourski v. Ashcroft*, 355 F.3d

1038, 1039 (7th Cir. 2004). We trust that IJs will not continue to insist on corroborating evidence when common sense and institutional experience suggest that there is none to be had. Additionally, we remind those evaluating administrative records that adverse credibility determinations should not be grounded in trivial details or easily explained discrepancies; as recounted above, an adverse credibility determination must be supported by "specific, cogent reasons" that "bear a legitimate nexus to the finding." *Ahmad*, 163 F.3d at 461.[10]

---

[10] We note that, even if we had disagreed with the BIA's credibility determination, we would be hesitant to remand this case to the BIA. It is clear from the administrative record that, at the time of Ms. Korniejew's asylum hearing, the government of Poland did not condone religious discrimination and, indeed, that "[c]urrent law place[d] Protestant, Catholic, Orthodox, and Jewish communities on the same legal footing." A.R. 86. The 1997 Country Report also noted that although "[a]nti-Semitic feelings persist among certain sectors of the population, occasionally manifesting themselves in acts of vandalism and physical or verbal abuse," "surveys in recent years show a continuing decline in anti-Semitic sentiment, and avowedly anti-Semitic candidates fare very poorly in elections." *Id.* In short, between the time that Ms. Korniejew left Poland in 1989 and the time of her hearing in 1998, the circumstances for Jews in Poland had improved markedly. Furthermore, the most recent International Religious Freedom Report establishes that circumstances continue to improve; it notes that "[t]he Constitution provides for freedom of religion, and the Government generally respects this right in practice." *See* U.S.D.O.S. International Religious Freedom Report (Poland) at 1. When State Department documents establish changed country conditions, we have stated that a remand is not required. *See Dobrota v. INS*, 195 F.3d 970, 974 (7th Cir. 2000) (stating that "remand would be futile in light of most current

(continued...)

## Conclusion

For the foregoing reasons, the petition for review is denied, and the judgment of the BIA is affirmed.

PETITION FOR REVIEW DENIED; AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[10] (...continued)
conditions in Romania as reflected in the most recent State Department report").

---