# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 06-1550

STEFAN SHMYHELSKYY,

*Petitioner,*

*v.*

ALBERTO R. GONZALES,

*Respondent.*

On Petition to Review an Order
of the Board of Immigration Appeals.
No. A 78-754-569

ARGUED JANUARY 5, 2007—DECIDED FEBRUARY 15, 2007

Before FLAUM, MANION and SYKES, *Circuit Judges.*

FLAUM, *Circuit Judge.* Stefan Shmyhelskyy, a native and citizen of Ukraine, petitioned for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied Shmyhelskyy's petition finding his hearing testimony incredible because of several discrepancies and a lack of corroborating evidence. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision. We deny Shmyhelskyy's petition for review.

## I. BACKGROUND

On August 27, 2000, Shmyhelskyy attempted to enter the United States at San Ysidro, California without a valid entry document. On September 22, the Department of Homeland Security ("DHS") initiated removal proceedings against Shmyhelskyy by filing a Notice to Appear charging him with removability under Immigration and Nationality Act ("INA") §§ 212(a)(6)(C)(ii) and 212(a)(7)(A)(i)(I). DHS also charged Shmyhelskyy with willful misrepresentation of his true identity for falsely representing that he was a United States citizen when entering the country.

On April 18, 2001, Shmyhelskyy filed a motion to change venue of the removal proceedings from San Diego, California, to Chicago, Illinois. In that motion, Shmyhelskyy admitted that he was a native and citizen of Ukraine; arrived at San Ysidro, California on or about August 27, 2000; applied for admission into the United States; and did not possess or present a valid immigrant visa or other valid entry document. Shmyhelskyy also conceded removability, but denied that he had misrepresented himself as a United States citizen. After the Immigration Court granted Shmyhelskyy's motion to change venue, Shmyhelskyy's hearing was set for October 19, 2001. Shmyhelskyy failed to appear at the hearing, and the IJ issued an in absentia removal order.

On December 26, 2001, Shmyhelskyy filed a motion to reopen the proceedings and rescind the in absentia removal order, which the Immigration Court granted on February 5, 2002. At a subsequent hearing, Shmyhelskyy admitted all of the factual allegations and conceded all of the removal charges in the notice to appear, including allegations that he willfully misrepresented his true identity by declaring himself to be a United States citizen.

**A.  Asylum Application**

On August 10, 2001, Shmyhelskyy filed an application for asylum, withholding of removal, and protection under CAT. In the application, he alleged that he was born in Ukraine on June 19, 1960. In 1995, his friend Oleksandr Nesenyuk introduced him to the Rukh Party ("RP"), which advocated for Ukrainian independence and democracy. Shortly thereafter, Shmyhelskyy became a member of the RP, campaigned for RP representatives to local and federal government offices, distributed literature and leaflets, organized meetings and lectures, and participated in protest rallies.

The application alleged that Shmyhelskyy participated in an unauthorized rally mourning the death of the RP leader on March 31, 1999. The Ukrainian police arrested Shmyhelskyy and several other rally participants, detaining them for three days. During the detention, the police deprived Shmyhelskyy of food and were slow to take him to the bathroom. Shmyhelskyy claimed that the police interrogated, harassed, and threatened him, but he did not allege any physical mistreatment. Shmyhelskyy also described an event on October 27, 1999 when the militia summoned him for openly criticizing government corruption. An investigator, Ivanek, harassed and threatened Shmyhelskyy for two hours and hit him several times on the neck and shoulders.

Shmyhelskyy additionally claimed that on May 1, 2000, he spoke at a rally accusing the Mayor and his son of corruption. Shortly after the rally, the police detained Shmyhelskyy for twenty-four hours, during which time they beat, harassed and threatened him, and warned him to "stop [his] propaganda." On July 26, 2000, Shmyhelskyy received an anonymous phone call warning him to check on his friend Nesenyuk. Shmyhelskyy discovered that Nesenyuk was in the hospital after being run over

by a truck as he left an RP meeting. That evening, Shmyhelskyy received a second anonymous phone call asking him if he still planned on criticizing the Mayor. The anonymous caller threatened that Shmyhelskyy would share Nesenyuk's fate. Shmyhelskyy feared for his life and left Ukraine on August 23, 2000.

### B. Asylum Hearing

At his hearing, Shmyhelskyy testified that he joined the RP in 1995, sponsored by his friend, Nesenyuk. He stated that he held an unpaid position with the RP and that the party classified him as an agitator. He testified that the police arrested him three times for his role in the RP. His testimony regarding his October 27, 1999 and May 1, 2000 detentions paralleled the testimony he provided in his asylum application. However, at his hearing Shmyhelskyy provided a significantly more detailed account of the March 31, 1999 detention. Shmyhelskyy testified that he attended a rally protesting the alleged assassination of the RP's leader. He stated that a military-type jeep arrived at the rally and that two uniformed police got out of the jeep. The police took him to a "general militia precinct," where they placed him in a preliminary detention cell. Shmyhelskyy recounted that the police later transferred him for twenty-four hours to a smaller three meters by four meters cell that lacked "facilities."

The police transferred Shmyhelskyy a second time to an even smaller cell that also lacked facilities. On the third day, Ivanek asked him, "Aren't you sick of being here?" Ivanek placed a blank piece of paper in front of Shmyhelskyy and directed him to sign it. When Shmyhelskyy refused, Ivanek told him to stand still, stood behind him, and struck Shmyhelskyy on the neck causing him to fall to the ground. Shmyhelskyy testified that he felt someone kicking him, and he believed that it was

more than one person because there were so many blows. Ivanek then told Shmyhelskyy to sign the blank document, and again he refused. Shmyhelskyy testified that when the police took him back to his cell, he repeatedly asked to use the facilities. He testified that he had to "pee in [his] pants[,]" and that "when [he] was beat up like that and I don't know if you know or not but I couldn't hold my bowel movement so I kind of, it was really bad, bad situation I was in."

Shmyhelskyy also testified about the phone call informing him of Nesenyuk's accident. He said that when he visited Nesenyuk in the hospital, Nesenyuk told him that he regretted sponsoring Shmyhelskyy's membership in the RP and that he should run for his life and try to save himself.

Shmyhelskyy stated that his wife and child remained in Ukraine without incident and that his parents and his wife's parents receive state pensions. He testified that he had been seeing a therapist, Monika Gutkowska, a graduate student in clinical psychology at the Chicago School of Professional Psychology, since March 2003. Shmyhelskyy offered Gutkowska's affidavit, which stated that Shmyhelskyy's psychological trauma was consistent with the abuse and torture he suffered in Ukraine.

Under cross examination, Shmyhelskyy acknowledged that a frontrunner in the 2004 presidential race was a candidate backed by a group that included the RP. He also admitted that he failed to include in his asylum application the March 31, 1999 beating. He conceded that the March 31 beating was more "brutal" than the October 27, 1999 beating. On re-direct examination, Shmyhelskyy testified that the events in Ukraine still affected him, that he had trouble sleeping, and that he saw Gutkowska to help him cope. He also testified that he feared returning to Ukraine because of Nesenyuk's incident, noting that if

"they kill famous journalists . . . [or] kill known people[,] they could really dispose of . . . a rank-and-file person."

On re-cross examination, Shmyhelskyy admitted that he sought treatment from Gutkowska three years after he had been in the United States and that he had stopped seeing her three weeks before the hearing. Shmyhelskyy testified that he did not know that a report from his therapist would be submitted to the Immigration Court and that he did not envision that his treatment history and assessment would be important for his case. The IJ did not allow Gutkowska to testify but told Shmyhelskyy's counsel that he could "embellish the report in [his] closing." Shmyhelskyy's counsel did not object.

### C.  IJ's Decision

On November 3, 2004, the IJ denied Shmyhelskyy's application for asylum, withholding of removal, and relief under CAT, ordering him removed from the United States. Specifically, the IJ concluded that Shmyhelskyy's claim was "unconvincing" and "not credible." Initially, the IJ noted that he was "extremely troubled" by Shmyhelskyy's admission that he falsely claimed to be a United States citizen and subsequent denial that he made such a claim. The IJ stated that this inconsistency was not necessarily material to his application for asylum, but observed that "it demonstrate[d] a predilection to distort the facts, [which was] a relevant consideration when [Shmyhelskyy] [wa]s asking the Court to accept his account of events at face value and without any independent corroboration."

The IJ further concluded that Shmyhelskyy's testimony regarding his fear of returning to Ukraine was vague and unconvincing. The IJ noted that Shmyhelskyy testified that the Mayor whom he criticized had lost re-election, and yet he testified, without explanation, that while adminis-

trations may change, the political leadership had not changed.

Additionally, the IJ stated that Shmyhelskyy testified in "great detail" about his March 31, 1999 detention, but his asylum application made "absolutely no mention of any physical mistreatment" he suffered during that detention. The IJ believed that this was revealing because Shmyhelskyy testified that the beating he received on that date was so "vicious that he lost control of his bowels and was not allowed to clean himself up." The IJ held that "a beating so severe that one would lose control of his bowels is a 'particularly invasive event' which one would expect to be set forth in an applicant's asylum application." The IJ also concluded that this was not a situation where Shmyhelskyy's testimony simply amplified the details in his asylum application, but "rather his testimony recount[ed] a brutal physical attack, which [wa]s not mentioned at all in his application for asylum." Moreover, the IJ seemed particularly troubled by the fact that Shmyhelskyy could not explain his failure to "detail this assault in his application."

Moreover, the IJ also discounted Shmyhelskyy's purported corroborating evidence. Shmyhelskyy submitted 1) a certificate of membership in the RP; 2) a letter of recommendation for membership in the RP; 3) a summons, requiring his presence before Ivanek; and 4) Nesenyuk's affidavit stating that he had been involved in a vehicle accident with unknown individuals who warned him to cease his anti-Communist propaganda. The IJ noted that the name on the membership certificate did not match Shmyhelskyy's, that the letter of recommendation did not demonstrate that Shmyhelskyy "was persecuted on account of his political activities, or . . . that [he] ha[d] a well-founded fear of persecution," and that the summons only "establishe[d] that [Shmyhelskyy] appeared before . . . Ivanek 'as accused' between the hours of 10 am and 12 pm

on October 27, 1999 . . . ." Finally, the IJ noted that Nesenyuk's affidavit did not mention Shmyhelskyy and that it was neither specific nor detailed with regard to the identity of the perpetrators or the basis for Nesenyuk's belief that these unknown individuals were responsible for the car accident.

The IJ acknowledged that the State Department's 2001 and 2003 Country Reports noted that the Ukrainian government's human rights record remained poor and that the 2003 report stated that "'[p]oliticians, politically connected businessmen, and journalists were the victims of attacks that sometimes were fatal and may have been politically motivated." The IJ concluded that although the reports reflected that Ukraine was in a "continual state of political turmoil," the record did not establish that Shmyhelskyy, "a low-level political operative, was persecuted in the past or will be persecuted in the future." Finally, the IJ denied Shmyhelskyy's applications for withholding of removal and protection under CAT because he failed to provide credible evidence in support of his asylum application.

On September 1, 2005, the BIA adopted and affirmed the IJ's decision.

## II. DISCUSSION

Where, as here, the BIA adopts the IJ's rationale, we review the IJ's decision. *Ursachi v. INS*, 296 F.3d 592, 594 (7th Cir. 2002). For this Court to disturb the IJ's decision, Shmyhelskyy must show that "the evidence not only supports reversal but compels it." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992). In other words, this Court will reverse only if it determines that the evidence compels a different result, and not simply because it is convinced that it would have decided the case differently. *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995).

Credibility determinations also enjoy a highly deferential review so long as they are "supported by specific cogent reasons that bear a legitimate nexus to the finding." *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004). Credibility determinations are questions of fact and should only be overturned under extraordinary circumstances. *Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).

### A. Asylum

Shmyhelskyy argues that his testimony before the IJ established a credible claim for asylum.[1] The Attorney General has broad discretion to grant asylum to an alien who is a refugee. *Koval v. Gonzales*, 418 F.3d 798, 804 (7th Cir. 2005). The INA defines a refugee as an alien who is unable or unwilling to return to the country of his nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). The alien bears the burden of proving his statutory eligibility for asylum by showing past persecution or a well-founded fear of future persecution. *Cuevas v. INS*, 43 F.3d 1167, 1170 (7th Cir. 1995).

Proof of past persecution or a fear of future persecution is established, in part, by the information contained in the asylum application, including the alien's detailed statements about his mistreatment and other evidence, if

---

[1] The credibility analysis in this case is not affected by the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, because Shmyhelskyy filed his asylum petition before Congress passed that statute. *See Diallo v. Gonzales*, 439 F.3d 764, 766 n.1 (7th Cir. 2006).

available. *Capric*, 355 F.3d at 1085. The alien is required to provide either a convincing explanation of any discrepancies or extrinsic—and credible—corroborating evidence if the IJ finds the testimony to be incredible. *See, e.g.*, *Balogun*, 374 F.3d at 500 (citing *de Leon-Barrios v. INS*, 116 F.3d 391, 393-94 (9th Cir. 1997)).

The IJ denied Shmyhelskyy's request for asylum because the IJ found his claims incredible. The IJ identified three problems with Shmyhelskyy's testimony: 1) despite conceding that he falsely claimed to be a United States citizen when attempting to enter the country, Shmyhelskyy later denied that he made this claim; 2) Shmyhelskyy's testimony concerning his fear of returning to Ukraine was vague and unconvincing; and 3) Shmyhelskyy failed to include any details about the March 31 beatings in his asylum application. The IJ also held that Shmyhelskyy's corroborating evidence was insufficient to overcome his lack of credibility.

Shmyhelskyy argues that he did not claim United States citizenship when entering the country. However, Shmyhelskyy admitted all of the factual allegations and conceded all of the removal charges in the notice to appear, including allegations that he verbally declared himself to be a United States citizen and wilfully misrepresented his true identity. He also did not object when the government included as part of the record, Form I-213, which stated that Shmyhelskyy "applied for admission into the United States from Mexico by claiming to be a United States citizen." Shmyhelskyy asserts that the IJ erred by forming an opinion during the merits hearing because this caused him undue prejudice. The IJ conceded that Shmyhelskyy's lack of candor compelled the IJ to view his testimony with great suspicion; however, there is no evidence whatsoever that the IJ did not consider all of Shmyhelskyy's testimony.

Shmyhelskyy next claims that the IJ failed to set forth the basis for his finding that Shmyhelskyy's testimony was vague and unconvincing. This is inaccurate. The IJ pointed to Shmyhelskyy's testimony that the Mayor he criticized on May 1, 2000 lost his bid for re-election in 2002. Shmyhelskyy testified that the winner of the 2002 election was a member of the opposition party supported by the RP. However, Shmyhelskyy also testified that despite this change in administration, the political leadership had not changed. Both the government and the IJ asked Shmyhelskyy to explain this inconsistency, but he could not do so.

Shmyhelskyy also contends that the fact that he testified in greater detail about the March 31 beating at his hearing than in his asylum application should not be the basis for attacking his credibility. We have not hesitated to reverse an IJ's credibility assessment when grounded in trivial details or easily explained discrepancies. *See Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003). In *Georgis*, a native and citizen of Ethiopia applied for asylum because of her membership in a specific political group targeted by the Ethiopian government. The IJ denied the petitioner's application because of six discrepancies in her hearing testimony. Four of the discrepancies were based on the petitioner's confusion translating dates from the Julian calendar (used in Ethiopia) into dates from the Gregorian calendar (used in the United States). The most important discrepancy was the fact that in her asylum application the petitioner failed to detail an event in September 1993 when she and her son were arrested, taken to prison, beaten up, and detained for a day and a half. *Id.* at 964. At her hearing, the petitioner acknowledged that she failed to mention the arrest in her asylum application but explained that she "didn't count [it] as imprisonment" because she thought imprisonment meant longer term detention in the country's central prison. We reversed the IJ's credibility

assessment because "having found that the other five reasons given by the IJ for discrediting [the petitioner were] either unsupported by the evidence in the record or based on incomplete or improperly excluded evidence, we [were] not inclined to defer to his credibility determination on this remaining sixth ground alone." *Id.* at 970.

By contrast, in *Korniejew v. Ashcroft*, 371 F.3d 377, 386 (7th Cir. 2004), we upheld an IJ's adverse credibility assessment because the petitioner was unable to explain a significant discrepancy between her hearing testimony and her asylum application. In *Korniejew*, the petitioner was a native and citizen of Poland who testified that she experienced past persecution as a Jew. She included in her asylum application details of an event in which skinheads kidnapped her and threatened to kill her if she did not withdraw complaints she made to the Attorney General. She claimed that after this event she moved in with her grandparents and then left for the United States. However, during her removal hearing, the petitioner failed to mention the kidnapping. She stated that she "maybe forgot to mention it. Because it was a lot of years ago." *Id.* at 380 n.3. When the government pointed out that this was the most recent event, the petitioner said, "well, I mean they kept me overnight but they didn't do all that much to me. I mean they, they beat me up a little." *Id.* We held that the petitioner's failure to testify to the kidnapping was significant, noting that the incident involved physical injury to the petitioner, it was the only time she was held overnight, and it was her most recent encounter with those threatening her. *Id.* at 384. We also noted that the petitioner did not offer a reasonable explanation for her failure to testify about the kidnapping.

On balance, the omissions in this case are more like the ones in *Korniejew* than in *Georgis*. Shmyhelskyy attempts to distinguish *Korniejew*, arguing that he testified fully to the event which precipitated his decision to leave the

United States. However, *Korniejew*'s outcome did not rest solely on the fact that the event the petitioner failed to detail was the one which precipitated her trip to the United States. Rather, the Court also noted that the omitted event involved physical injury to the petitioner and was the only time she was held overnight. Even more important was the petitioner's inability to explain the discrepancy. Shmyhelskyy admitted that the beating he suffered during the March 31 detention was the most brutal he experienced. While it was not the most recent beating, it was the most severe and it was the longest detention Shmyhelskyy suffered. *See Capric*, 355 F.3d at 1090 (stating that "it is reasonable to expect particularly invasive events to be mentioned in asylum applications"). Moreover, Shmyhelskyy provided no reason for his failure to allege this beating in his asylum application. Indeed, when the IJ asked Shmyhelskyy about the omission, Shmyhelskyy stated, "I could not even explain that now."

Shmyhelskyy also takes issue with the IJ's determination that he was incredible because he did not provide sufficient corroborating evidence. This Court has warned immigration judges that "it is unreasonable to expect asylum applicants to procure corroborating documents when official records are in disarray either because of war, revolution, or simply lack of institutional regularity." *Korniejew*, 371 F.3d at 387. However, the bar is higher where the IJ finds a petitioner's testimony incredible. 8 C.F.R. § 1208.12(a); *Uwase v. Ashcroft*, 349 F.3d 1039, 1041 (7th Cir. 2003) ("Corroborative evidence is essential to bolster an otherwise unconvincing case."). Shmyhelskyy submitted a certificate of membership in the RP with the wrong name printed on it, a letter of recommendation for membership in the RP, a "Notice to Appear" requiring his presence before Ivanek on October 27, 1999, and Nesenyuk's affidavit. We agree with the IJ's determination that this corroborating evidence did not meet the

high bar necessary to surmount an adverse credibility decision.

Given our deferential review of an IJ's credibility determinations, the substantial evidence in this case does not compel reversal.

## B.  Withholding of Removal

Shmyhelskyy contends that he presented a credible claim for withholding of removal. The Attorney General "may not remove an alien to a country if [he] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." INA § 241(b)(3). To be eligible for withholding of removal, an applicant must demonstrate a clear probability of persecution. *INS v. Stevic*, 467 U.S. 407, 410 (1984). Because Shmyhelskyy did not meet his burden of proof in establishing eligibility for asylum, he has necessarily failed to meet the more stringent requirement of a clear probability of persecution. *See Stankovic v. INS*, 94 F.3d 1117, 1119 (7th Cir. 1996) ("Given the relationship between these required showings, if an applicant cannot prevail in his request for asylum, he cannot prevail in his request for the withholding of deportation.").

## C.  Convention Against Torture

Shmyhelskyy maintains that he is entitled to relief under the CAT. An applicant for withholding of removal under CAT bears the burden of proving that it is "more likely than not" that he would be tortured if removed to the proposed country of removal. 8 C.F.R. § 1208.16(c)(1). This burden is also "a more stringent requirement than the requirements for asylum" and given that the evidence does

not establish a case for persecution, Shmyhelskyy falls short of establishing a case that he will be tortured upon his return to Ukraine. *See Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004).

### D.  Due Process

Finally, Shmyhelskyy claims that the IJ violated his due process rights by refusing to allow Gutkowska to testify at his hearing as an expert. We review de novo Shmyhelskyy's claim that the IJ denied him due process. *Kerciku v. INS*, 314 F.3d 913, 917 (7th Cir. 2003). Pursuant to 8 C.F.R. § 240.10(a)(4), an alien in any immigration proceeding is entitled to "a reasonable opportunity to examine and object to the evidence against him or her, to present evidence in his or her own behalf and to cross-examine witnesses presented by the government." This Court has stated that "[i]n the context of political asylum, due process requires, among other things, that an applicant receive a 'meaningful opportunity to be heard.'" *Kerciku*, 314 F.3d at 917. To warrant a new hearing, Shmyhelskyy must demonstrate prejudice, which occurs when the due process transgression is "likely to impact the results of the proceedings." *Capric*, 355 F.3d at 1087-88.

Shmyhelskyy's due process claim fails because the IJ's exclusion of Gutkowska's live testimony did not prejudice him. We have held that the exclusion of live testimony is prejudicial when the testimony would have added something that was otherwise missing from the record. *Niam v. Ashcroft*, 354 F.3d 652, 658-60 (7th Cir. 2004) (noting that facts contrary to the conclusions of the State Department's country report were missing from the record); *Kerciku*, 314 F.3d at 918 (excluded testimony would have provided evidence of persecution that the petitioner already suffered); *Podio v. INS*, 153 F.3d 506, 511 (7th Cir. 1998) (excluded testimony would have

corroborated facts rejected by the IJ as uncorroborated). In this case, however, the IJ admitted Gutkowska's affidavit. Moreover, Shmyhelskyy has not explained what additional information Gutkowska would have provided that would have affected the IJ's decision. Indeed, Shmyhelskyy admits that the government made no effort to discredit the affidavit. Accordingly, the IJ did not violate Shmyhelskyy's due process rights by excluding Gutkowska's live testimony.

## III. CONCLUSION

For the above stated reasons, we DENY Shmyhelskyy's petition for review.

A true Copy:

     Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*