# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3148

YE MON AUNG,

*Petitioner,*

v.

ALBERTO R. GONZALES,

*Respondent.*

———————

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A98-365-506

———————

ARGUED MAY 4, 2007—DECIDED JULY 26, 2007

———————

Before POSNER, MANION, and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Ye Mon Aung is a native and citizen of Burma who entered the United States in 2003 aboard a ship docking in Texas. Aung requested asylum and, after finding his way to Wisconsin, a hearing was held. The immigration judge (IJ) denied the request for asylum, as well as Aung's requests for withholding of removal and deferral of removal under the Convention Against Torture (CAT). The Board of Immigration Appeals affirmed the decision of the IJ without opinion, and Aung petitioned this court for review. Finding no error in the IJ's decision, we deny the petition for review.

## I.  BACKGROUND

On May 3, 2005, Aung appeared before the IJ in support of his applications for asylum, withholding of removal, and deferral of removal under the CAT. Aung testified at his hearing and submitted identifying documents, photos, and reports on country conditions.

*A.  Aung's Testimony*

Aung lived in Rangoon, the capital of Burma, and opposed the military governmental regime.[1] He supported the National League for Democracy (NLD), although he was not a member. In 1988, Aung participated in a large-scale popular Burmese uprising in protest of the government by joining a student hunger-strike. Aung faced no government retaliation for this protest.

In 1996, Aung began work as a crewman on a ship. His job took him out to sea for long stretches of time. In 1997, port officials requested a bribe from Aung upon his return from sea. When Aung refused, the officials confiscated his passport and seaman's identity card. This interfered with his ability to work as a seaman.

In 1998, some acquaintances of Aung's from the 1988 uprising contacted him and asked if he would join them in a ten-year anniversary rally. Aung was pleased to do so. He and the others spread the word that they planned to march to downtown Rangoon. The day that the rally was to take place, August 8, 1998, Aung went to a tea shop to

---

[1] The military authorities in Burma promote the use of the name "Myanmar" as the conventional name for the state, but the United States has not recognized this change. *See* CIA, The World Fact Book, *available at* https://www.cia.gov/library/publications/the-world-factbook/geos/bm.html#top.

meet with other protesters. Before they could begin their march, military trucks surrounded them and the protestors were arrested.

During his detention, Aung was interrogated, kicked, punched, and beaten. He was very frightened. Aung repeatedly claimed that he had only gone to the tea shop to purchase a cup of coffee. After three days, Aung was released and warned to stay away from political activities and associated people.

In 1999, Aung purchased back his passport and seaman's license. He set sail in 2000, stopping in different ports around the world, and did not return to Burma until June 2002. During his seafaring travels, Aung met some students in Thailand who were interested in the issue of forced labor in Burma. Aung explained that the Burmese government commonly used forced labor in the country's rural areas. The students proposed that they exchange information and Aung agreed to gather information on forced labor and send it to the students. He also agreed to bring the students' newsletters and other documents urging democracy's return to Burma. Upon arriving in Burma, Aung photocopied the students' materials and distributed them to his close friends and family.

When he returned to Burma in 2002, Aung lived with his sister in Rangoon. He called upon his relatives, including a cousin, to gather information on forced labor in the countryside surrounding the small town in which his mother lived. Once he received information from his family, Aung then passed it along to a friend who regularly traveled to Thailand. His friend delivered the information, and messages from Aung, to the students in Thailand. Aung sent information to Thailand twice; the first such transaction took place in July 2002. Later that year, the police called Aung and other known supporters of democracy to the local station and warned them to stay

away from politics. The officers did not mention Aung's forced labor information exchange.

Aung's cousin was arrested by Burmese officials later that year. Aung had no information regarding the reasons for, or circumstances surrounding, this arrest. He believed it may have had something to do with the forced labor information that his cousin sent to him. Fearing that he might be next, Aung hid at a friend's home in the Rangoon suburbs. While in hiding, he heard, by word of mouth, that military intelligence officers had been looking for him at his mother's home and also in Rangoon. He also heard that his mother had been threatened with arrest and the closure of her business. Aung feared for his safety and contacted a "broker" to request assistance in fleeing the country.

Aung left Burma on January 28, 2003. He traveled through several European countries, Mexico, and eventually arrived in Texas. Aung has spoken to his mother and sister by telephone since his flight from Burma. They informed him that the authorities had visited his mother's home on two occasions and that officials had detained, interrogated and threatened his mother in their effort to locate Aung.

## B.  The IJ's Decision

Aung conceded at his asylum hearing that his 1998 arrest and beating did not rise to the level of past persecution but nonetheless argued that he held a well-founded fear of future persecution on the basis of his political opinion. R. p. 100. The IJ found that Aung's testimony at the asylum hearing was not credible and that Aung did not have an objectively well-founded fear of future persecution. The IJ, therefore, denied Aung's asylum petition.

The IJ based his conclusions on several aspects of Aung's testimony. The IJ noted that Aung was not politically active in any way after his final return to Burma in 2002 other than to exchange information with the students in Thailand, and that Aung had traveled in and out of Burma on many occasions. R. p. 49-50.

The IJ characterized Aung's testimony regarding his cousin's arrest as "vague and confusing." R. p. 51. Aung initially stated that his cousin was arrested for supplying information to him, but then admitted that he had merely heard by word of mouth that his cousin was arrested, without any information as to why or how. R. p. 51, 82. As to Aung's testimony that military intelligence officers had looked for him at his mother's home, the IJ noted that Aung based "his claim essentially on information received from a trader, who was passing by his mother's home, some seven hours away from Rangoon, where he lived." R. p. 52. The IJ further noted that Aung could not explain why the authorities would look for him at his mother's, rather than where he lived with his sister in Rangoon. R. p. 52.

Aung was able to leave Burma without any difficulty after securing an exit permit. Shortly before he left Burma, Aung also obtained an extension of his passport. R. p. 53. Furthermore, the issue of forced labor in Burma is no secret. It has been well documented through the work of international organizations as well as in U.S. State Department Human Rights Reports. R. p. 53. Aung does not suggest that he received any notoriety for his information dissemination or that his name was ever published in relation to the forced labor cause. R. p. 54. Aung traveled through a number of countries before arriving in the United States, and did not file for asylum in any of them. The IJ concluded that, in essence, Aung had merely made "an unsupported allegation that military intelligence would like to speak to him." R. p. 55.

Having determined that Aung did not meet the standards for asylum, the IJ concluded that he could not meet the higher standards required for withholding of removal under § 241(b)(3) of the Immigration and Nationality Act (INA) or relief under the CAT. Thus, the IJ denied all three of Aung's requests.

## II. ANALYSIS

Where, as here, the BIA adopts the IJ's decision without comment, we review the IJ's findings of fact and reasoning as though they were those of the BIA itself. *Boci v. Gonzales*, 473 F.3d 762, 765-66 (7th Cir. 2007) (citing *Mousa v. INS*, 223 F.3d 425, 428 (7th Cir. 2000)). We apply the substantial evidence standard, and "uphold the BIA's denial of relief as long as it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007) (quoting *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006); *Koval v. Gonzales*, 418 F.3d 798, 804 (7th Cir. 2005)).

### A.  Asylum

An applicant claiming asylum as a refugee must show that he is "unable or unwilling to return to [his] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . .". 8 U.S.C. § 1101(a)(42)(A); *see Sina*, 476 F.3d at 461. "The applicant bears the burden of proving that he is eligible for asylum." *Sina*, 476 F.3d at 462 (quoting *Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723 (7th Cir. 2005) (citing *Jamal-Daoud v. Gonzales*, 403 F.3d 918, 922 (7th Cir. 2005); 8 C.F.R. § 208.13(a))). We will not disturb the IJ's decision unless the petitioner shows that "the evidence

not only supports reversal but compels it." *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 478 (7th Cir. 2007) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992)).

An IJ's adverse credibility determinations "must be made with reference to specific, cogent reasons that bear a legitimate nexus to the finding." *Adekpe v. Gonzales*, 480 F.3d 525, 530 (7th Cir. 2007). Such determinations are afforded substantial deference. *Korniejew v. Ashcroft*, 371 F.3d 377, 382 (7th Cir. 2004).

We cannot say that the IJ's adverse credibility determination was not supported by substantial evidence in this case. Aung's stated reasons for his fear fell apart upon questioning, revealing that his claims were supported by mere rumors and speculation. When questioned as to why he believed that the authorities might arrest him for distributing information on forced labor, Aung admitted that he had never been caught with such materials. Despite repeated opportunities to do so, Aung was unable to explain how the authorities might have learned of his activities, and why they might care. The following excerpt from the asylum hearing is exemplary:

Q: Well you were never caught with any material like leaflets, or the magazine articles about [forced] labor, correct?

A: No, no, no, not like that.

Q: So I don't understand why the military officer would be asking your mother about you for any reason.

A: At the time, (indiscernible) was released from house arrest, and when I go back in 2002, the army called me and then they told me to stay away from politic.

Q: But they had no information that you'd ever been involved in politics did they?

> A:  I was arrested one time in 1998, and at that time, they warned me not to be involved in politic in the future.

R. p. 93. Aung points only to his 1998 arrest, which was years before he sent information on forced labor to Thailand, and which he concedes did not amount to persecution. Many of Aung's other answers were equally nonresponsive. *See, e.g.,* R. p. 81, 83, 87, 90, 96.

Nor could Aung support his claim that his cousin was arrested because of their information smuggling activities. Upon questioning by the IJ, Aung admitted that he in fact did not know why his cousin was arrested, but merely speculated that it could have been because he passed information to Aung. R. p. 82.

When questioned about any trouble that the Burmese government had caused his mother because of his political views, Aung said that they expect her to feed the rice from her business to their soldiers and to sell rice to the government at a discounted price. R. p. 91. But this, and the fact that Aung had to pay bribes for travel documents, are very consistent, as the IJ noted, with the general corruption that is unfortunately common in Burma. R. p. 95. Indeed, Aung was able to move in and out of the country with as much ease as can be expected given the corruption.

While we have warned that discrepancies that may arise due to an applicant's limited English skills should not be held against him, this is not that case. *See Jamal-Daoud*, 403 F.3d at 923. Aung had the benefit of an interpreter at the asylum hearing and there is no indication that the interpreter was deficient in any way. Throughout the hearing, Aung asked for clarification when he did not understand the questions asked of him. The IJ appeared to patiently question Aung in order to reach the answers to his questions. Aung even stated that

the reason he applied for asylum in the United States, but not in any of the other countries he traveled through, was because of his familiarity with the English language. R. p. 97.

We therefore cannot say that the IJ's decision was based on anything but the legitimate discrepancies, non-responsive answers, and general weaknesses in Aung's case. The IJ's adverse credibility determination was supported by substantial evidence and we will not disturb it.

Where, as here, the IJ finds the applicant's testimony incredible, his claim for asylum will fail unless he can provide "a convincing explanation of the discrepancies or extrinsic—and credible—corroborating evidence." *Korniejew*, 371 F.3d at 382-83 (citing *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004)). Aung has done neither. He was unable to explain the discrepancies in his testimony, and offered little evidence outside of his testimony. The IJ had Aung's statement that he made when he applied for asylum, a photo of Aung commemorating the sixteenth anniversary of the 1988 popular uprising in front of the Burmese Embassy in New York City, Aung's identifying documents and educational credentials, a 2004 U.S. State Department Human Rights Report, and a 2004 Reporters Without Borders Report, none of which did anything to support Aung's fear of future persecution, either subjectively or objectively. The BIA's denial of Aung's request for asylum must stand.

### B.   Withholding of Removal and the Convention Against Torture

An applicant seeking withholding of removal under § 241(b)(3) of the INA must demonstrate a clear probability of future persecution. 8 U.S.C. § 1231(b)(3); *Shmyhelskyy*, 477 F.3d at 481. An applicant seeking

deferral of removal under the CAT must show that it is "more likely than not" that he will be tortured if removed. 8 C.F.R. § 1208(16)(c)(2); *Shmyhelskyy*, 477 F.3d at 482. As both of these standards are greater than that required of asylum applicants, Aung's failure to prevail on his asylum claim necessarily precludes the success of either his withholding of removal claim or his CAT claim. *Shmyhelskyy*, 477 F.3d at 481-82 (citing *Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004); *Stankovic v. INS*, 94 F.3d 1117, 1119 (7th Cir. 1996)).

## III.  CONCLUSION

For the foregoing reasons, Aung's petition for review is DENIED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*