In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2915

ACHOUR AID,

Petitioner,

v.

MICHAEL B. MUKASEY, Attorney General
of the United States,[Œ]

Respondent.

_____

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A-77-656-337

_____

ARGUED APRIL 9, 2008—DECIDED AUGUST 1, 2008

_____

Before POSNER, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge. Achour Aid entered the United
States from Algeria in 1996 on a non-immigrant visitor
visa, and in 2003, the Immigration and Naturalization

_____

[Œ] We substitute Michael B. Mukasey, the current Attorney
General of the United States, as the Respondent in this action.
See Fed. R. App. P. 43(c)(2).

Service ("INS")[1] charged Aid as being removable as an alien who stayed longer than allowed pursuant to 8 U.S.C. § 1227(a)(1)(B). Aid applied for asylum and withholding of removal on the basis of a political opinion and membership in a particular social group, or alternatively, voluntary departure. The Immigration Judge ("IJ") dismissed Aid's claim for asylum as untimely, denied his claim for withholding of removal, and granted his request for voluntary departure. Aid appealed to the Board of Immigration Appeals ("BIA") only the IJ's denial of his application for withholding of removal based on political opinion. The BIA agreed with the IJ's decision and dismissed Aid's appeal. Aid petitions this court for review, and we deny.

## I.

Achour Aid was born in Ouzera, Algeria, and owned a hardware store in his home town, which he operated without incident until 1993. At that time, radical Islamists were waging an armed struggle against the Algerian government. Before the IJ, Aid testified that in 1993, members of a terrorist group came to his store after it was closed. He knew some of the men, but not others. There were several terrorist groups in the area, but he did not know which one they were part of. The men, whose faces were covered but for their eyes, entered his store and took everything they wanted. Aid stated that the terrorists targeted his store because they could not obtain hardware supplies in the city where there was a

---

[1]  The INS merged into the Department of Homeland Security in 2003. *See Wood v. Mukasey*, 516 F.3d 564, 566 (7th Cir. 2008).

larger and constant police and military presence. The terrorists had spies who would let them know when there was no military in the village.

The terrorists returned a second time, and Aid allowed them to enter the store and take what they wanted. After the terrorists came a third time, Aid contacted the police and filed a report. Aid testified that he reported this third incident to the police because he did not want the police or the army to think that he was one of the terrorists.[2] According to Aid, the police did not conduct an investigation, but rather merely asked him for descriptions of the men and what they took.

The terrorist came a fourth time. Like their first visit, the terrorists came at night. When Aid refused to open the door to his home, the terrorists forced open a window and dragged Aid outdoors. One of the men pointed a gun to his head and another put a knife into his stomach. The man with the knife stated, "I'm going to kill you, . . . you have to work for us . . . we're doing this for this country." At that point, Aid opened the store for them. The men loaded merchandise into their car and then handed Aid a list of materials telling him that they wanted him to purchase the listed supplies. The next day, Aid again reported this to the police who wrote down Aid's account of the incident, but took no further action.

---

[2] Aid noted that there had been a nearby grocer whose goods the terrorists stole. The grocer did not report the thefts to the police. As a result, the army killed him because they thought that he was aiding the terrorists by willingly providing the terrorists with food.

Following the fourth incident, Aid closed his shop and moved to Medea to live with his sister; Medea is approximately eight miles from Ouzera. Aid testified that in contrast to Ouzera where there were no police and the army only drove around during the day and left at night, Medea was a big city where there was a larger and continual police and military presence. Aid also noted that it would be hard for the terrorists to find him in Medea. A month after he moved to Medea, the terrorists went to his father's house in Ouzera. The terrorists told his father to tell Aid to return to Ouzera and to bring with him the supplies on the list that they had given him. They also stated that they would find Aid wherever he went.

In Medea, Aid opened another store and hired his brother-in-law, Mostefaoui Abdelkader, and put him in charge of purchasing. Leaving Abdelkader in charge of the store, in June 1994 Aid traveled to Tunisia, Switzerland, and France to purchase automobiles for resale in Algeria. While in Switzerland, Aid testified that an Algerian man whom he did not know approached and asked him to give him the car that Aid was purchasing stating, "you give me the car, I'll take care of everything and I'll give you the car back." The same man approached him two weeks later inquiring whether Aid had gotten the car, to which Aid responded that he had not gotten the car and would not be getting one. The man replied, "[I]f you want us to forgive you about what you did back in Algeria, you have to help us now." After this encounter, Aid feared that he was on a hit list, though the man made no mention of such list.

On January 17, 1995, while Aid was still in Switzerland, Abdelkader was fatally shot by someone in a car driving by while Abdelkader was closing the shop one night. No merchandise was taken from the store. At his hearing

before the IJ, when asked if he knew who killed Abdelkader, Aid responded, "No, I don't know. Nobody know, knew who it, who they were." He indicated that "hundreds of people died the same way, by drive-by shootings." Aid then stopped his automobile resale business, returned to Algeria, sold his store merchandise, and came to the United States.

Aid entered the United States on August 11, 1996, using a nonimmigrant visitor's visa, which expired on February 8, 1997. Aid did not seek an extension, and on January 10, 2003, the INS charged Aid as being removable as an illegal overstay pursuant to 8 U.S.C. § 1227(a)(1)(B). An IJ conducted a hearing on September 4, 2003, at which Aid conceded removability. Aid later applied for withholding of removal and asylum on the basis of political opinion and membership in a particular social group.

On March 15, 2006, the IJ conducted a hearing on Aid's application for asylum and withholding of removal. The IJ found Aid credible, but concluded that the evidence did not support a conclusion that Aid was persecuted "because the terrorists imputed a political opinion to him once he refused to continue to supply them with the requested materials." The IJ further noted that Aid never openly refused the men, nor did he indicate that he did not support their cause. Regarding Abdelkader's murder, the IJ concluded that there was no evidence that it was a result of Aid's refusal to provide the terrorists with supplies and noted that Abdelkader could have been killed because of his own actions, independent of Aid's interactions with the terrorists. The IJ also concluded that Aid did not suffer persecution, and even if there was persecution, conditions in Algeria had significantly changed for the better since Aid's departure, and

his family remained unharmed and unthreatened in Algeria. The IJ accordingly denied his claim for withholding of removal. The IJ also dismissed Aid's claim for asylum as untimely and granted his request for voluntary departure.

Aid appealed to the BIA, appealing only the IJ's decision on withholding of removal on the basis of political opinion. The BIA agreed that Aid had not established a nexus between the terrorist's activities and any actual harm or protected ground. The BIA also found that Aid was a target because he owned a store and had access to materials the terrorists desired and not because of any political opinion. Aid petitions for review.

## II.

In his petition for review, Aid argues that he is entitled to withholding of removal for persecution based on political opinion and membership in a social group. Initially, we note that we do not have jurisdiction to consider Aid's claim that his status as a store owner qualifies as a social group. Aid did not assert this claim in his brief to the BIA and has therefore failed to exhaust his administrative remedies. *Huang v. Mukasey*, 525 F.3d 559, 563-64 (7th Cir. 2008); *see* 8 U.S.C. § 1252(d)(1). However, we have jurisdiction to review the BIA's denial of relief for persecution because of political opinion.

"Because the BIA adopted and affirmed the opinion of the IJ, we review the IJ's decision as supplemented by any discussion in the BIA's opinion." *Tarraf v. Gonzales*, 495 F.3d 525, 531 (7th Cir. 2007). We review the decision denying withholding of removal under the substantial evidence standard; in other words, the IJ's decision must

be "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Sina v. Gonzales*, 476 F.3d 459, 461 (7th Cir. 2007) (citations omitted). We may not reverse simply because we would have decided the case differently. *Margos v. Gonzales*, 443 F.3d 593, 597 (7th Cir. 2006) (citations omitted). Instead, we will reverse only if the evidence compels a contrary conclusion. *Youkhana v. Gonzales*, 460 F.3d 927, 931 (7th Cir. 2006) (citation omitted).

To establish eligibility for withholding of removal, a petitioner "must demonstrate a clear probability of persecution on account of his 'race, religion, nationality, membership in a particular social group, or political opinion.'" *Tariq v. Keisler*, 505 F.3d 650, 656 (7th Cir. 2007) (quoting 8 U.S.C. § 1231(b)(3)(A)). In turn, "to establish a clear probability of persecution, the applicant 'must demonstrate that 'it is more likely than not that [he] would be subject to persecution' in the country to which he would be returned.'" *Id.* (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 423 (1987)). If the petitioner demonstrates past persecution, he is entitled to a presumption of future persecution, and the burden shifts to the government to rebut the presumption that the petitioner will suffer persecution. *Irasoc v. Mukasey*, 522 F.3d 727, 530 (7th Cir. 2008).

Aid argues that the BIA erred in affirming the IJ's conclusion that he failed to establish a nexus between his claimed fear of persecution and a protected basis, specifically a political opinion. Aid contends that the terrorists imputed a political opinion to him because he refused to assist them and that the political opinion motivated the terrorists to persecute him. To establish persecution on account of political opinion, the petitioner must show that he was persecuted because of *his* political opinion,

not the political opinion of his persecutor. *See INS v. Elias-Zacarias*, 502 U.S. 476, 482-483 (1992). In a case where a petitioner asserts that a political opinion was imputed to him, he must show that his "persecutors attributed a political opinion to [him], and this attributed opinion was the motive for the persecution." *Mema v. Gonzales*, 474 F.3d 412, 417 (7th Cir. 2007) (citations omitted). The "mere existence of a generalized 'political' motive underlying [the terrorists' actions] is inadequate to establish . . . the proposition that [the alien] fears persecution *on account of* political opinion, as § 101(a)(42) [of the Immigration Naturalization Act] requires." *Id.* at 482.

Aid failed to show that the evidence compels a conclusion that he suffered persecution on account of his political opinion. There is no evidence that anything other than a desire for supplies motivated the terrorists, much less a political one. Neither Aid nor any family member was a political party member or held government employment. There is no evidence that Aid confronted the terrorists or openly opposed them. Aid cites *Lim v. INS*, 224 F.3d 929, 932-33 (9th Cir. 2000), and *Gonzales-Neyra v. INS*, 122 F.3d 1293, 1294-95 (9th Cir. 1997), in support of his claim. However, contrary to Aid's contention, neither of these cases is analogous to Aid's circumstance. In *Lim*, the petitioner was a police officer who had infiltrated Communist student groups, investigated a unit that killed public officials, and testified in open court against organization leaders in the Philippines. 224 F.3d at 932. The Ninth Circuit concluded that the threats the petitioner received were partly motivated by an imputed political opinion. *Id.* at 934. Aid's activities are distinguishable from those of the petitioner in *Lim*. Aid was a private citizen who was not engaged in any sort of government

employment or enforcement activities to undermine the terrorists. Aid's simple refusal to provide the terrorists with additional supplies (for which the terrorists were not paying) contrasts starkly with the petitioner's in *Lim* substantial involvement in the Philippine government's attempts to shut down a Communist unit. Similarly, Aid's situation is not analogous to the petitioner in *Gonzales-Neyra*, who "was threatened only after he expressed his political disagreement with the guerrilla organization, and only after he made clear that his refusal to make further payments [for protection] was on account of that disagreement." 122 F.3d at 1294. Gonzales-Neyra went so far as to tell the guerillas that "he was not going to 'collaborate with them anymore, because that was not part of his idea; that he was not going to collaborate with a group that was trying to destroy his country.' " *Id.* at 1295. Aid, on the other hand, did not express a political opposition to the terrorists. In fact, there no is evidence in the record of Aid expressing any political opinion, much less not to the terrorists.

Aid did report the third and fourth incidents to the police, but there is no evidence that the terrorists were aware of these reports. Further, as evinced by his own testimony before the IJ, Aid did not go to the police with the intent of allying himself with the Algerian government or getting the terrorists into trouble. Rather, his motivation was self-preservation: he sought to protect himself from misdirected retribution by the army mistakenly thinking that he was working in concert with the terrorists by providing them with hardware supplies. *See Hernandez-Baena v. Gonzales*, 417 F.3d 720, 723-24 (7th Cir. 2005) (holding that a petitioner did not suffer persecution on account of a political opinion because

the petitioner himself testified that "he refused to comply with the request of the [guerrillas] because he did not want to go to jail for violating Columbian law—not because of a political opinion"). As Aid's counsel stated at oral argument, he was trying to stand up for himself, not stand up against the terrorists. Moreover, when the terrorists visited his father, the message they left for Aid was that they wanted him to return to his store and to provide them with the supplies on the list. They did not mention Aid's police reports or any political viewpoint; the terrorists wanted their supplies. Aid's own testimony that the terrorists could not obtain the hardware merchandise needed in the city confirmed that the terrorists were motivated to track Aid down because he could acquire the necessary chemicals and other supplies that the terrorists sought. Similarly, the Algerian man who approached him in Switzerland did not mention Aid's visits to the police.[3] Bound by the substantial evidence standard, we cannot say that the evidence compels a conclusion that a political opinion and not Aid's ownership of a hardware store spurred the terrorists in their actions against Aid.

Aid also claims his brother-in-law Abdelkader's murder was revenge motivated by an imputed political opinion. The evidence, however, does not support Aid's contention. Aid testified that no one knew who killed

---

[3] The man did state, "[I]f you want us to forgive you about what you did back in Algeria, you have to help us now." However, the record does not flesh out what the man meant by what Aid "did back in Algeria," and the evidence does not compel a conclusion that it meant anything other than that it referred to Aid's closure of his Ouzera store and not supplying the supplies on the list.

Abdelkader. Other than the fact that Abdelkader was killed in a drive-by shooting while closing the hardware store, there was no other evidence presented about the murder. He was one of "hundreds of people [who] died the same way, by drive-by shootings." Thus, there is no evidence supporting Aid's contention that the murder was motivated by a political opinion imputed to Aid.

Finally, Aid cites the knife-wielding terrorist's statement, "[Y]ou have to work for us . . . we're doing this for this country," as evincing a political motivation for the attack. This statement reflects a political opinion, but not Aid's opinion. It reflects the terrorist's belief that he and his comrades were acting for the betterment of their nation and that they were exploiting Aid for his hardware supplies. If this, without more, was sufficient to establish a political opinion, imputed or otherwise, then any victim once caught in the cross-hairs of a war-torn nation or a country rife with political violence would be eligible to seek immigration protection in this country on account of political opinion. The immigration code, however, is not so broad in the relief it affords. Only if the "persecution is on account of the *victim's* political opinion, not the persecutor's" is withholding of removal available. *INS v. Elias-Zacarias*, 502 US 476, 482 (1992).

Reasonable minds may disagree with the IJ's decision. However, considering the record as a whole and taking Aid's testimony as credible, we conclude that the evidence does not compel a conclusion contrary to the one reached by the IJ. Rather, "reasonable, substantial, and probative evidence" exists to support the IJ's denial of Aid's petition for withholding of removal based on a political opinion because Aid did not establish that the terrorists's actions toward him were because of his political opinion, actual or imputed.

### III.

Substantial evidence supports the BIA's decision that Aid failed to establish that he was persecuted on account of his political opinion. Accordingly, we DENY Aid's petition for review.