In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-1535

AHMED HASSAN,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A99-023-706

ARGUED FEBRUARY 18, 2009—DECIDED JULY 2, 2009

Before ROVNER, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Ahmed Hassan, an Ethiopian national, petitioned for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). The Immigration Judge ("IJ") denied Hassan's petition, concluding that inconsistencies between Hassan's asylum application and hearing testimony rendered his claims incredible and, alternatively, that Hassan failed to

show the persecution necessary to establish asylum eligibility. The Board of Immigration Appeals ("BIA") affirmed the IJ's decision. We deny Hassan's petition for review.

## I. Background

On November 4, 2005, Hassan attempted to enter the country at Chicago's O'Hare airport under the "Visa Waiver Program," *see* 8 U.S.C. § 1187, using a fake Swedish passport. Immigration officials determined that the passport was invalid and detained Hassan. The Department of Homeland Security commenced "asylum-only" proceedings before an Immigration Judge to effect Hassan's removal. *See id.* § 1187(b)(2); *Mitondo v. Mukasey*, 523 F.3d 784, 785-86 (7th Cir. 2008). Hassan requested asylum, withholding of removal, and protection under the CAT.

## A. The Asylum Application

In his asylum application, Hassan stated that he is an Ethiopian national and an ethnic Oromo. Hassan's father was an "important figure" in an organization fighting for the independence of the Oromo people. In 1986, when Hassan was six years old, his father and uncle were killed during an armed conflict with the Ethiopian military. Fearing that the Ethiopian government would retaliate against Hassan's family for his father's military activities, Hassan's mother relocated the family to the neighboring country of Djibouti, where they resided illegally.

Hassan's application further stated that in 2004 he agreed to accompany his cousin, Anwar Gamada, back to Ethiopia to visit Anwar's dying mother. Anwar's mother died the day after their arrival, and they went to a burial ceremony. At the grave site, a truck carrying five to seven Ethiopian soldiers arrived, and Hassan told Anwar that "[t]hey have come for us." Hassan and Anwar started running. A soldier shouted at Hassan and Anwar to stop, but they continued to flee. The soldiers fired two shots, missing Hassan, but hitting and killing Anwar.

Hassan escaped to Djibouti and reported the shooting incident to his mother. Fearing that the incident would lead the Ethiopian authorities to discover Hassan's whereabouts, Hassan's mother hired a smuggler to get Hassan out of Djibouti. Hassan traveled through Yemen and Italy, staying in each country for about two months. He then traveled through Germany, Denmark, and Sweden before finally arriving at Chicago O'Hare. Hassan requested asylum based on persecution for his political opinion and membership in a particular social group.

## B. The Asylum Hearing

At the asylum hearing on May 2, 2006, Hassan testified before the IJ via video conferencing. Hassan elaborated that his father and uncle were soldiers in the Oromo Liberation Front ("OLF"), a politico-military organization dedicated to the rights of the Oromo people. Hassan is not himself an OLF member. In describing his 2004 return to Ethiopia to visit his dying aunt, Hassan added that the Ethiopian government had confiscated his aunt's

house, leaving her destitute. Regarding the shooting at the burial ceremony, Hassan acknowledged that the soldiers shot at him and Anwar only after they started running. The soldiers did not fire on any of the other burial attendees, none of whom tried to flee. The soldiers shouted at Hassan to stop but did not call him by name or say anything about his ethnicity.

Hassan also testified about a number of repressive acts against his family not mentioned in his asylum application. He stated that, just prior to his father's death, Ethiopian soldiers threatened his mother that they would "exterminate the whole family" if the father did not stop his military activities. When the IJ asked why Hassan had not included that threat in his written application, Hassan stated that "at that time . . . I was in sort of a confusion . . . they interpreted to me in another language, which is Amharic." In response, the IJ pointed out that Hassan had sworn at the beginning of the hearing that he went over the application "in a language that [he] understood" and that the application was "correct and complete."

Hassan recounted that, following the death of his father in 1986, Ethiopian soldiers burned down the family's previous house, although the family had safely moved by that point. When asked on cross-examination why he failed to mention the house burning in his written application, Hassan stated that he was unaware that "the rules" required him to include this information.

Finally, Hassan testified that, following his escape from the shooting incident and return to Djibouti, his family relocated to another Djibouti community to avoid detec-

tion. After the family learned that the Djibouti police had searched for them at their prior home, Hassan's mother hired a smuggler, Mustafa, to get Hassan out of the country. The IJ confronted Hassan on his failure to include this search in his application. Hassan responded that "[n]obody has raised this question about who bothered me." The IJ again pointed out that Hassan had sworn that his application was correct, and that several questions on the application specifically ask "whether or not he was ever mistreated in the past."

In addition to his own testimony, Hassan offered the testimony of his aunt, Mahbuba Nasir, and his second cousin, Faisal Mohamed. Both confirmed that Hassan was an ethnic Oromo. Nasir testified that Hassan's father was involved in the OLF and killed in 1986, while Mohamed testified that the government persecuted the families of those affiliated with the OLF.

## C. The IJ's Decision

On May 12, 2006, the IJ rendered an oral decision denying Hassan's asylum application. The IJ determined that Hassan's hearing testimony was incredible based on a number of "new factual assertions" omitted from Hassan's written application, including the 1986 threat by Ethiopian soldiers to Hassan's mother, the burning of the family's house, the confiscation of Anwar's mother's house, and the search for Hassan by the Djibouti police. The IJ further concluded that Hassan failed to provide a plausible explanation for why he omitted these events from his application. When questioned about the

omissions, Hassan was either unresponsive or "tried to indicate . . . that he did not understand the information in the application and had no opportunity to provide the information." Hassan's claim that he did not understand the application was "expressly inconsistent with his earlier testimony under oath to the Court that the information was reviewed in the Oromo language" and "that all the information was true, correct and complete. . . . Therefore, the only explanation presented to the Court by the respondent is patently false." The IJ accordingly denied Hassan's asylum application "based on an adverse credibility finding."

The IJ held in the alternative that, even if Hassan "had presented credible and consistent testimony," he nonetheless failed to show the persecution necessary to establish asylum eligibility. Hassan had no evidence that the 2004 shooting incident was related to his father's OLF activities. The IJ noted that Hassan traveled through several countries without applying for asylum before arriving in Chicago, suggesting that he left Djibouti out of a desire to come to the United States rather than a fear for his life.

The IJ also considered the background evidence submitted by Hassan, including country conditions reports prepared by the State Department and the affidavit of Professor Halberson, an expert in African Political Science. The IJ acknowledged that this evidence indicated that the Ethiopian government continues to engage the OLF in armed conflicts. Further, the ruling party frequently mistreats political minorities and the Oromo people, who

make up 40% of the Ethiopian population. However, the IJ concluded that Hassan could not rely on these general conditions of violence and mistreatment to prove his claim of persecution, especially since Hassan was not an OLF member or an outspoken political activist.

## D. The BIA's Decisions

On September 11, 2006, the BIA affirmed the IJ's decision, concluding that Hassan failed to show the persecution necessary to establish asylum eligibility. The BIA also found that the IJ's adverse credibility determination was not clearly erroneous. The BIA agreed with the IJ that Hassan's claim that he did not understand the asylum application was inconsistent with his earlier testimony that he reviewed the application in a language that he understood. Because Hassan provided a "false excuse" for omitting certain events from his application, the IJ properly determined that Hassan's testimony was incredible.

After Hassan petitioned for review of the BIA's decision, this court remanded so that the BIA could consider the application of the REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)), to Hassan's application. In its subsequent opinion, the BIA moderated its view of the IJ's adverse credibility finding, acknowledging that the IJ may have mischaracterized portions of Hassan's hearing testimony. In particular, the BIA accepted Hassan's explanation that his apparent lack of responsiveness to the IJ's questions resulted from problems with the video

conferencing. The BIA also noted that the IJ erroneously stated that Hassan testified that he had reviewed the application in "Oromo." In fact, Hassan had sworn only that he reviewed the application in a language that he "understand[s]." He was confused by an application question translated to him in Amharic, a language that he understands but not as well as his native Oromo. Nonetheless, the BIA concluded that this mischaracterization of Hassan's testimony was harmless. Since Hassan's claim that he did not understand the application was inconsistent with his earlier testimony that he reviewed the application in a language that he understood (albeit not Oromo), the IJ had a sufficient basis for deeming Hassan incredible.

The BIA also addressed Hassan's argument that the IJ mischaracterized his explanation for the omission of a specific event from his application. According to Hassan, the IJ misinterpreted his statement that no one ever asked him specifically about the Djibouti police's search for his family as a much broader statement that no one ever asked him about any past mistreatment. The BIA noted, however, that Hassan cited deficiencies in the application questions to justify a number of omitted events, not just the Djibouti police search. The BIA also found it understandable that the IJ was frustrated with Hassan's failure to include this particular search in his application, since that event was "one of the major reasons for his alleged fear of returning to Ethiopia."

Hassan timely petitioned this court for review of the agency's denial of his asylum application. Hassan argues

that the record does not support the agency's findings that Hassan's testimony was incredible and that he failed to show persecution. Hassan also argues that the agency erred in denying his claims for withholding of removal and protection under the CAT.

## II.  Analysis

Where, as here, the BIA affirms, adopts, and supplements the IJ's decision, we review "both the immigration judge's decision and any additional reasoning of the BIA." *Mema v. Gonzales*, 474 F.3d 412, 416 (7th Cir. 2007) (citation omitted). "We must affirm the [agency's] decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole, and overturn it only if the record compels a contrary result." *Id.* Credibility determinations in particular receive "a highly deferential review so long as they are supported by specific cogent reasons that bear a legitimate nexus to the finding." *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 479 (7th Cir. 2007) (quotation omitted).

### A.  The Adverse Credibility Determination

In order to establish eligibility for asylum, the applicant has the burden of showing status as a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A "refugee" is one who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.*

§ 1101(a)(42)(A). The applicant may prove refugee status through his own uncorroborated testimony, "but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." *Id.* § 1158(b)(1)(B)(ii). Given the importance of the applicant's credibility in asylum proceedings, "an adverse credibility finding will doom the applicant's claimed eligibility as a 'refugee.'" *Musollari v. Mukasey*, 545 F.3d 505, 508-09 (7th Cir. 2008).

In making an adverse credibility determination, the IJ may rely on inconsistencies between the applicant's hearing testimony and earlier statements. *Adepke v. Gonzales*, 480 F.3d 525, 531 (7th Cir. 2007). In particular, the IJ may question the credibility of an applicant who describes significant events of persecution during his live testimony but omits those events from his written asylum application. *Tarraf v. Gonzales*, 495 F.3d 525, 532-33 (7th Cir. 2007). Under our prior case law, only those omitted events that "go to the heart of the asylum applicant's claim" could support an adverse credibility finding. *Adepke*, 480 F.3d at 531. However, for applications such as Hassan's filed after May 11, 2005, an amendment to the Immigration and Nationality Act ("INA") expands the category of inconsistencies on which the agency may rely. "Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on . . . the consistency between the applicant's . . . written and oral statements . . . without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim . . . ."

REAL ID Act of 2005, Pub. L. No. 109-13, div. B, § 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)(iii)); *see also Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) ("[T]he Real ID Act allows an immigration judge in asylum cases to consider, in determining credibility, falsehoods or inaccuracies 'without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim.'").

Although the REAL ID Act requires a highly deferential review of credibility findings, Immigration Judges may not rely on inconsistencies that are completely trivial, *Kadia*, 501 F.3d at 822, or that result from a misunderstanding or mischaracterization of the applicant's testimony, *cf. Musollari*, 545 F.3d at 509-10 (identifying several implausible interpretations of the applicant's testimony made by the IJ). Accordingly, our cases upholding adverse credibility findings based on inconsistencies between an applicant's testimony and application generally involve an attempt by the applicant to manufacture claims of recent, severe abuse.

In *Korniejew v. Ashcroft*, 371 F.3d 377 (7th Cir. 2004), the applicant described an overnight kidnapping by religious persecutors in her application but failed to recall that event during her hearing testimony. Because the alleged kidnapping was the applicant's "most recent personal encounter with those threatening her" and involved "physical injury," we held that the failure to testify to that event supported an adverse credibility finding. *Id.* at 384-85. Relying on *Korniejew*, we concluded in *Shmyhelskyy*, 477 F.3d at 480-81, that the appli-

cant's testimony that he was severely beaten following his arrest was sufficiently inconsistent with his application statement that he was merely detained to find the applicant incredible.

Similarly, in *Tarraf*, the applicant's testimony about his 30-day detention and torture conflicted with his written application, which described only a 3-day interrogation without physical abuse. These discrepancies, which related to "the length and severity of *the critical incident*" of the persecution claim, were sufficient to find the applicant incredible. *Tarraf*, 495 F.3d at 533 (emphasis in original). It was likewise apparent in *Torres v. Mukasey*, 551 F.3d 616, 632-33 (7th Cir. 2008), that the applicant's testimony that his captors subjected him to water torture, threatened to execute him, and forced him to run nude in front of his co-prisoners—all absent from his written application—described new events that were "significant" enough to support an adverse credibility determination.

By contrast, in *Georgis v. Ashcroft*, 328 F.3d 962, 968 (7th Cir. 2003), we held that the applicant's omission of an arrest and beating from her application did not support an adverse credibility determination, where the IJ had also relied on minor inconsistencies regarding the exact dates of persecution events. We also concluded in *Adepke*, 480 F.3d at 531-32, that inconsistencies regarding the exact date of the assassination of the applicant's father-in-law, as well as the exact methods used to torture the applicant during an interrogation, were too immaterial to find the applicant incredible.

With these cases as a backdrop, and mindful that the REAL ID Act further expands the agency's discretion to make adverse credibility determinations, we examine the inconsistencies between Hassan's hearing testimony and his written application. The IJ cited four events that Hassan described during the hearing but omitted from his application: (1) the Ethiopian soldiers' threat to Hassan's mother that they would kill the entire family if the father did not cease his OLF activities; (2) the burning of the family's previous house; (3) the confiscation of the house of the aunt whose burial Hassan attended in 2004; and (4) the Djibouti police's search for Hassan's family at their prior home following the 2004 shooting incident.

These events do not directly contradict Hassan's written application and are arguably not central to his asylum claim. The threats against Hassan's mother and burning of the family's house occurred in 1986, when Hassan was six years old, meaning that these events lack the recency that we found important in *Korniejew*. These earlier incidents, along with the burning of the aunt's house, were also not within Hassan's firsthand knowledge and did not involve government acts "in which he personally was targeted." *Tarraf*, 495 F.3d at 533. And none of these events approaches the severity of the beatings or torture in *Korniejew*, *Shmyhelskyy*, *Tarraf*, and *Torres*.

Although the Djibouti police's search for the family is more recent and particular to Hassan, that event does not go directly to Hassan's theory of persecution, which rests on the Ethiopian authorities' targeting him

for his family's political views. Hassan does not claim that the Djibouti police were seeking to punish him for his ties to an Ethiopian politico-military organization. Rather, Hassan surmised that the Djibouti government was interested in his family as illegal Oromo refugees subject to repatriation to Ethiopia.

Still, these omitted events are hardly trivial. Because Hassan bases his asylum claim on persecution for the political views of his family, we think that he would be inclined to mention past threats and pillaging against his family in his asylum application. Indeed, one of the questions on the application form that Hassan completed asked directly whether "you, your family, or close friends or colleagues ever experienced harm of mistreatment or threats in the past by anyone?" Additionally, unlike in *Georgis* and *Adepke*, the IJ in this case did not highlight trivial inconsistencies between Hassan's descriptions of these events in his application and in his live testimony. Instead, the IJ focused on the complete absence of these events from Hassan's asylum application.

So, in sum, the adverse credibility determination in this case rests on omitted events that are neither critical nor trivial to Hassan's claim of persecution. Given the REAL ID Act's highly permissive standard for adverse credibility determinations, we conclude that the IJ could properly rely on these material omissions to discredit Hassan's testimony. The asylum statute, as amended by the Act, makes clear that an IJ may rely on discrepancies that do not go "to the heart of the applicant's claim" or on

"any other relevant factor." 8 U.S.C. § 1158(b)(1)(B)(iii).
Considering all of the relevant factors in the case, the IJ
could conclude that Hassan's testimony about events
not disclosed in his application was an attempt to "embel-
lish" his asylum claim. *See Tarraf*, 495 F.3d at 533. Such
an adverse credibility determination, based on non-
trivial discrepancies between the applicant's written
application and live testimony, is entitled to deference
under the REAL ID Act.

We also credit the agency's reliance on Hassan's travel
through several countries prior to arriving in the United
States. In two of these countries, Yemen and Italy,
Hassan remained for at least two months without
seeking asylum. As stated by the IJ, after living in
Djibouti for eighteen years without harm from the Ethio-
pian government, Hassan's departure and passage
through several countries was more consistent with a
desire to settle in the United States than a fear for his
life. Although we do not say that failure to seek asylum
in intermediate countries is always inconsistent with a
fear of persecution, in this case, it was one of several
"relevant factors" that the agency could consider in
finding Hassan's testimony incredible. *See* 8 U.S.C.
§ 1158(b)(1)(B)(iii); *cf. Tarraf*, 495 F.3d at 534 (recognizing
that return travel to the country of persecution may be
a factor weighing against an applicant's credible fear
of persecution); *Balogun v. Ashcroft*, 374 F.3d 492, 500-01
(7th Cir. 2004) (upholding an adverse credibility deter-
mination based in part on the applicant's multiple prior
trips to the United States and the United Kingdom with-
out seeking asylum).

Our conclusion that the IJ "could" properly rely on the events omitted from Hassan's asylum application does not end the credibility analysis, for the IJ did not rely solely on those omissions. The IJ also determined that the explanations that Hassan provided for omitting the events were either non-responsive or "patently false." As recognized by the BIA, however, the IJ may have mischaracterized portions of Hassan's testimony in concluding that his explanations were unreasonable. We must therefore determine whether any mischaracterizations of Hassan's testimony tainted the IJ's adverse credibility determination.

One mischaracterization is the IJ's statement that Hassan testified that he had reviewed the application in "Oromo." In fact, Hassan only swore that he reviewed the application in a language that he "understand[s]." Hassan further testified that part of the application was translated in Amharic, a language that Hassan understands but not as well as his native Oromo. The IJ missed this distinction and concluded that Hassan "either testified falsely that he had reviewed the application in the Oromo language and reviewed it and made corrections, or he testified falsely that he did not go over the information prior to its filing." Since the IJ's misstatement that Hassan reviewed the entire application in "Oromo" was so intertwined with the critical finding that Hassan "testified falsely," the IJ's error regarding the application language gives us pause.

Nonetheless, based on our review of the hearing testimony, we do not believe that the IJ's erroneous reference

to Oromo tainted the credibility analysis. After Hassan testified about the Ethiopian soldiers' threat to his mother, the IJ asked why Hassan did not include that event in his application. Hassan responded that the application questions confused him because "they interpreted to me in another language, which is Amharic." Then, the IJ pointed out that Hassan had previously testified that he went over the application "in a language that [he] understood." From this exchange, it is clear that the IJ was not concerned with whether Hassan reviewed the application in "Oromo" or "Amharic" specifically. Rather, the IJ relied on the inconsistency between Hassan's initial statement that he reviewed the application in a language that he understood and his subsequent explanation that the application questions confused him. The IJ's erroneous reference to "Oromo" was harmless.

The IJ also stated that Hassan "tried to indicate that he was not . . . asked the questions on the application . . . and had no opportunity to provide the information." The IJ found that this explanation for the omitted events was incredible in light of Hassan's earlier testimony that he reviewed the application and verified that "all the information was true, correct and complete." Hassan argues that the IJ mischaracterized his explanation for the omission of a single event, the Djibouti police's search for his family, as a sweeping claim that no one ever asked him about any past mistreatment. Hassan points to a portion of the hearing when he testified that no one asked him about the Djibouti police search specifically. The IJ responded that Hassan could not claim that the

application did not ask "whether he was mistreated in the past," since "at least half a dozen specific questions" on the application addressed past mistreatment.

Based on our review of the hearing transcript, we disagree with Hassan that the IJ overemphasized Hassan's response regarding a single, omitted event. True, the IJ's comment that Hassan could not claim that the application did not ask about past mistreatment immediately followed Hassan's testimony about the Djibouti police search. However, we read this comment as a fair characterization of Hassan's recurring claim that he had no opportunity to provide information on the various events omitted from his application. The IJ's point was that, since multiple questions on the application asked about past mistreatment, it was unconvincing for Hassan to cite deficiencies in the application to explain any of the omissions.

Because our review of the record indicates that any mischaracterizations of Hassan's testimony did not color the IJ's credibility analysis, the agency's adverse credibility determination is supported by substantial evidence.

### B. Persecution Based on an Imputed Political Opinion

Although the agency's adverse credibility determination is alone sufficient to deny Hassan's petition, we acknowledge that the events omitted from Hassan's application are not critical to his claim of persecution. We also note that the IJ's finding that Hassan testified

falsely involved a mischaracterization of Hassan's testimony, albeit a harmless one. Based on these reservations, we think it best to review the agency's alternative holding that, even if Hassan's testimony were credible, he failed to show the persecution necessary to establish asylum eligibility.

We review the agency's conclusion that the harm that Hassan allegedly suffered did not rise to the level of persecution under the substantial evidence standard. *Tarraf*, 495 F.3d at 534. Under that standard, we will reverse only if the record compels a different result, and not simply because we are convinced that we would have decided the case differently. *Shmyhelskyy*, 477 F.3d at 478-79. To justify reversal, the evidence in support of the application must be "'so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution.'" *Georgis*, 328 F.3d at 967-68 (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 484 (1992)).

As mentioned above, in order to establish eligibility for asylum, the applicant has the burden of showing status as a "refugee." 8 U.S.C. § 1158(b)(1)(B)(i). A "refugee" is one who is unable or unwilling to return to his country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id.* § 1101(a)(42)(A). The applicant may qualify as a refugee either because he has suffered "past persecution" or because he has a "well-founded fear of future persecution." 8 C.F.R. § 1208.13(b). An applicant who shows past persecution on account of a protected trait

is entitled to a presumption of refugee status. *Id.* § 1208.13(b)(1). In order to establish refugee status based on a well-founded fear of persecution, the applicant must show that his "fear is subjectively genuine and objectively reasonable in light of credible evidence." *Musollari*, 545 F.3d at 508 (quotation omitted). The fear is objectively reasonable if a "reasonable possibility" exists that the applicant would suffer persecution on account of a protected trait upon returning to his country of nationality. 8 C.F.R. § 1208.13(b)(2)(i)(B).

Hassan claims both past persecution and a well-founded fear of future persecution on account of his membership in a family of OLF supporters and an imputed political opinion. He argues that the Ethiopian authorities attribute to him the political views of his family members, particularly his father, a former OLF member.

Our case law recognizes that an applicant may suffer persecution on account of the political opinions held by family members and imputed to the applicant. *See BinRashed v. Gonzales*, 502 F.3d 666, 673 (7th Cir. 2007) (finding substantial evidence of persecution of the son of a political activist); *Mema*, 474 F.3d at 415-16, 418-20 (reviewing evidence that persecutors imputed the views of the applicant's politically active father and twin brother); *Nakibuka v. Gonzales*, 421 F.3d 473, 478 (7th Cir. 2005) (examining whether persecutors perceived, correctly or not, that the house worker of an opposition leader was herself a political opponent). We have described this basis of persecution as on account of either an "imputed political opinion" or "membership in a

particular social group"—the family group. *BinRashed*, 502 F.3d at 670; *Mema*, 474 F.3d at 417. Under either characterization, the necessary proof is the same: the applicant must show that the persecutors attributed a political opinion to him, and that this attributed opinion was the motive for the persecution. *Mema*, 474 F.3d at 417 (citations omitted). It is not enough to show both a violent government act and the applicant's relationship to a political dissident; the applicant must link the two and "show that her family's political opinions have been imputed to her and that she has suffered or will suffer persecution as a result." *Ciorba v. Ashcroft*, 323 F.3d 539, 545 (7th Cir. 2003).

We examine Hassan's evidence to determine whether the record compels a finding of either past persecution or a well-founded fear of future persecution. As for past persecution, Hassan points to the 2004 shooting incident, reasoning that the Ethiopian soldiers fired at him and his cousin Anwar based on their fathers' political views. He surmises that a village informant told the Ethiopian government that he and Anwar had returned to Ethiopia and that the soldiers targeted them at the burial ceremony for their fathers' OLF activities.

We cannot agree with Hassan that the record compels this interpretation of events. No evidence links the shooting to any political views held by Hassan and Anwar or imputed to them based on the OLF activities of their long-deceased fathers. *See Aid v. Mukasey*, 535 F.3d 743, 747-48 (7th Cir 2008) (observing that no evidence indicated that terrorists who raided the applicant's store were

motivated by political goals, especially where the ap-
plicant was not politically outspoken); *Sankoh v.
Mukasey*, 539 F.3d 456, 471-72 (7th Cir. 2008) (finding no
evidence that the persecutors imputed a family political
opinion that the applicant "did not outwardly hold").
On the contrary, the only motive for the shooting sug-
gested by the record is the fact that Hassan and Anwar
were the only burial attendees who fled. The soldiers
never identified Hassan by name or confronted him
based on his family's ties to the OLF. *Cf. Nakibuka*, 421
F.3d at 475 (recounting that soldiers who detained and
beat the applicant addressed her by name and warned
her to stop supporting the political opposition); *Tolosa v.
Ashcroft*, 384 F.3d 906, 910 (7th Cir. 2004) (noting
that soldiers made derogatory comments about the ap-
plicant's Oromo ethnicity while beating and interrogating
her about the whereabouts of her father, a political defec-
tor).

Further, while we do not minimize the danger that
Hassan faced from being fired upon, the soldiers' isolated
shooting at unidentified suspects is distinct from the
recurring "detention, arrest, interrogation, prosecution,
imprisonment . . . beatings, or torture" of political oppo-
nents that typically sustain allegations of past persecution.
*Tarraf*, 495 F.3d at 535 (quotations omitted); *cf. BinRashed*,
502 F.3d at 671 (addressing allegations of past persecution
based on threats and detentions of a political opponent's
son); *Mema*, 474 F.3d at 418 (noting that the applicant
was allegedly detained and beaten for his father's
political activities).

Because the record does not compel Hassan's inter-pretation of the shooting incident, the agency's decision that Hassan failed to show past persecution is sup-ported by substantial evidence. Although another judge may have found past persecution on these facts, "we cannot say that the record compels a contrary result." *Mema*, 474 F.3d at 418.

By similar reasoning, substantial evidence supports the agency's finding that Hassan failed to show a well-founded fear of future persecution. Hassan argues that the 2004 shooting incident, in conjunction with his family history and background evidence of repression of OLF supporters, establishes a well-founded fear of political persecution. We have already discussed the lack of evidence linking the shooting to Hassan's family ties or political views. As for family history, Hassan's aunt, Mahbuba Nasir, and his second cousin, Faisal Mohamed, did testify that Hassan was an Oromo whose father was involved in the OLF and killed in combat. However, this testimony does not compel the conclusion that the Ethiopian government knew of Hassan's father's political views, attributed those views to Hassan, and would likely persecute Hassan based on those views. *Cf. BinRashed*, 502 F.3d at 668-69 (describing evidence that the Yemeni authorities had threatened to arrest the applicant for his father's political dissidence and later issued arrest warrants for him and his siblings); *Mema*, 474 F.3d at 415 (recounting the applicant's testi-mony that the police attacked him and his siblings for supporting their father in leading the opposition party).

Regarding background evidence, Hassan presented the IJ with reports by the State Department and other news and human rights organizations. These reports indicate that the Ethiopian government engages the OLF in armed conflicts and arbitrarily detains persons suspected of sympathizing with the political opposition. The expert affidavit of Professor Halberson further establishes that Oromos suffer a disproportionate share of this arbitrary treatment, since authorities tend to assume that Oromos are more likely to be OLF supporters. Hassan also cites a 2005 Human Rights Watch report indicating that the government has set up structures to monitor the Oromo population and harass outspoken political opponents. Human Rights Watch, Suppressing Dissent: Human Rights Abuses and Political Repression in Ethiopia's Oromia Region 27 (2005), *available at* http://www.hrw.org/sites/default/files/reports/ethiopia0505.pdf.

This background evidence does suggest that, as an Oromo in Ethiopia, Hassan is more likely to experience political repression by the Ethiopian government than members of other ethnic groups. However, we agree with the IJ that the general mistreatment of Oromos, who make up approximately 40% of the Ethiopian population, does not alone establish a well-founded fear of persecution. To establish an objectively reasonable fear of future persecution, Hassan must point to "*specific, detailed* facts showing a good reason to fear that he . . . will be singled out for persecution." *Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008) (emphasis in original) (quotation omitted). Hassan has not produced such facts. Although his witnesses established the family's ties to the

OLF, Hassan was not himself an OLF member, and nothing in the record indicates that he ever "express[ed] any political opinion" critical of the Ethiopian government. *Aid*, 535 F.3d at 748.

In sum, Hassan's evidence does not compel the conclusion that the Ethiopian government imputes a political opinion to him based on his family ties, much less that the government will target him for that opinion. It follows that the agency's determination that Hassan failed to show a well-founded fear of political persecution is supported by substantial evidence.

### C. Withholding of Removal and Protection Under the CAT

Finally, we briefly address Hassan's claims for withholding of removal and protection under the Convention Against Torture. The INA prohibits the Attorney General from removing an alien to a country where "the alien's life or freedom would be threatened . . . because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). An applicant seeking withholding of removal must demonstrate a "clear probability" of harm by showing that it is "more likely than not" that he will suffer persecution if removed. *BinRashed*, 502 F.3d at 670. Because this "clear probability" requirement is "more stringent" than the requirements for asylum eligibility, our rejection of Hassan's asylum petition necessarily dooms his withholding of removal claim. *Shmyhelskyy*, 477 F.3d at 481; *see also Bolante*, 539

F.3d at 795 ("Because we find that Bolante cannot meet his burden of proof on his asylum claim, his withholding of removal claim must fail *a fortiori*.").

As for Hassan's CAT claim, in order to obtain relief under the CAT, the applicant must show that it is "more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2). Although the torture need not be on account of one of the enumerated traits required for asylum claims, the burden of proof for CAT protection is nonetheless "more stringent" than the burden for establishing asylum eligibility. *Shmyhelskyy*, 477 F.3d at 481. Just as Hassan's evidence fails to establish a well-founded fear of persecution, it fails to show that it is more likely than not that he will be tortured upon being returned to Ethiopia.

### III. Conclusion

The agency's adverse credibility determination, based on material inconsistencies between Hassan's asylum application and hearing testimony, is supported by substantial evidence. The agency's alternative holding that Hassan failed to show the persecution necessary to establish asylum eligibility also finds substantial support in the record. We therefore DENY Hassan's petition for review.