In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-3357

GUIHU YANG,

*Petitioner,*

*v.*

LORETTA E. LYNCH,
Attorney General of the United States,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A089-678-703

---

ARGUED JUNE 8, 2016 — DECIDED AUGUST 12, 2016

---

Before BAUER, MANION, and KANNE, *Circuit Judges*.

MANION, *Circuit Judge*. Guihu Yang, a 52-year-old Chinese citizen from Shanxi province, petitions for review of the denial of his application for asylum based on his fears of forced sterilization under China's one-child policy. Because substantial evidence supports the IJ's conclusions that Yang was not credible and that he did not adequately corroborate his account, we deny the petition.

**Background**

Yang came to the United States in 2007 on a business-visitor visa he obtained by misrepresenting to U.S. officials that he hoped to attend a university conference. A few months later, he applied for asylum with U.S. Citizenship and Immigration Services, asserting that his wife twice had been forced to undergo abortions and that he had been fired from his job for refusing to be sterilized. His application was denied, and he was placed in removal proceedings for having overstayed his visa.

At his removal hearing, Yang renewed his application for asylum and testified about his family's encounters with China's family-planning apparatus. Yang and his wife, Xiping Yao, had a son born in 1990. The son apparently was in poor health. When asked to describe his son's condition, Yang simply said that the boy was "very weak" and caught colds easily but doctors' examinations produced no exact diagnosis. According to Yang, their son's poor health was the reason that he and his wife wanted to have a second child. In 2002 Yao became pregnant, and the couple sought permission to have a second child from the local birth-control committee. Their request was denied. Family-planning officials then began threatening them with fines and loss of their jobs unless Yao underwent an abortion. The couple eventually gave in, though Yang maintains that they had no real choice. After the abortion, officials continued to visit their home once or twice a month to remind them that they were not free to have another child.

In late 2006, Yao became pregnant again. To avoid attention, she moved in with Yang's parents in a village about an

hour's drive away. But within a month, family-planning officials from her workplace discovered her whereabouts, showing up at the home one night. Yang, who was not present because he had remained in the city to continue working, testified that the authorities "intimidated" her over the course of six hours and then forcibly took her to the hospital to have an abortion.

Yao also testified at Yang's asylum hearing and expanded on this episode. She said that the officials wore her down with their threats and intimidation, until she agreed to go back to her workplace and "resolve" the matter. On the ride back she fell asleep and awakened to find the car parked outside of a hospital. The officials dragged her out of the car, and at some point during her struggle with them she fell down a flight of stairs and was knocked unconscious. She said that the fall fractured her left arm and caused her to bleed from her lower body. Upon regaining consciousness, she realized that she had had an abortion. She remained in the hospital for three months—a stay necessitated, she said, because of her fractured arm.

After the episode, family-planning officials wanted Yang to be sterilized; his wife's health, they said, was too compromised after the abortion to undergo the procedure herself. Yang refused, and a few months later his employer fired him for doing so. Family-planning officials also frequented his home and demanded that he undergo sterilization. Fearing these visits, Yang said that he avoided his home and stayed with friends or relatives. On the few occasions that he did return home and encountered officials, he rebuffed them.

In November 2007 Yang left China, alleging that he feared being forcibly sterilized. Since his departure, his wife and

neighbors have told him that officials continue to look for him. His wife joined him in the United States in October 2012 on a tourist visa that she overstayed.

Yang supplemented his application with corroborative documents. He submitted a medical record from Yao's hospital stay—saying that she was hospitalized for three months because of a bone fracture and "broken nerve" on her left arm. He also included two letters from neighbors in China saying that family-planning officials had inquired about his whereabouts, as well as a letter from his workplace manager stating that he was fired for refusing to be sterilized, as required by the company's family-planning officials.

The IJ disbelieved the testimony of Yang and his wife, and denied his applications for asylum, withholding of removal, and protection under the Convention Against Torture. The IJ offered six reasons for finding Yang not credible. One reason had to do with Yang's testimony that he did not know in 2006 whether he could have a second child legally; the IJ found this testimony implausible, given Yao's abortion in 2002 and the frequent harassment that the couple said they endured from family-planning officials. Among other reasons, the IJ also believed that Yang had testified inconsistently about the details surrounding his son's allegedly poor health, about the visits that family-planning officials purportedly made to his home after his wife's second abortion, and about the particular circumstances in which he was fired from his job. The IJ also found Yao not credible, primarily because she struggled to answer questions and had difficulty remembering the details of the second abortion. Finally, the IJ concluded that, under the terms of the REAL ID Act, 8 U.S.C. § 1158(b)(1)(B)(ii), Yang had not provided sufficient corroborative evidence to

carry his burden of proof because he did not provide medical records confirming treatments or procedures received by either his wife or son during their hospitalizations.

The Board of Immigration Appeals upheld the IJ's decision, concluding that the IJ had properly supported her findings concerning credibility and corroboration. The Board highlighted three of the IJ's reasons for finding Yang not credible. First, Yang's statement that he did not know whether he and his wife legally could have a second child in 2006 was implausible, given the couple's past run-ins with family-planning officials and Yao's forced abortion earlier in 2002. Second, in his written statement accompanying his initial asylum application, Yang failed to mention any encounters with family-planning officials after his wife's second abortion or any reports that these officials sought him after he left China. Third, Yang testified inconsistently regarding the extent he stayed away from his own home after the second abortion and whether during this time he encountered family-planning officials.

The Board also agreed with the IJ that Yao's testimony was "insufficiently reliable and credible" because of her "absent-mindedness" and difficulty recalling details. And Yang's corroborative evidence was insufficient, the Board added, because the hospital record he submitted did not mention the abortion procedure and the letter from his manager did not explain why family-planning officials continued to pursue him after he was fired.

## Analysis

On appeal, Yang challenges three of the IJ's express rea-
sons (endorsed by the Board) for finding him not credible. If
the IJ had credited his testimony, his fears of forced steriliza-
tion could form the basis for a well-founded fear of future per-
secution. *See* 8 U.S.C. § 1101(a)(42)(B); *Chen v. Holder*, 604 F.3d
324, 330–31 (7th Cir. 2010). Regarding the IJ's first reason—
inconsistencies in his statements about whether he and his
wife lawfully could have a second child—he asserts that fam-
ily-planning enforcement is left to local officials' discretion,
and that he plausibly hoped that his son's chronic health con-
dition could justify an exemption to have a second child—as
permitted with other families whose first child had a disabil-
ity.

But the IJ reasonably could find this explanation uncon-
vincing. As the Board noted, just four years earlier in 2002,
Yao was forced to have an abortion despite whatever health
problems afflicted their son, and even afterwards the couple
was—in Yang's words—"frequently harassed" by officials
who told them that they could not have another child. More-
over, Yang has never specified the nature of the health issues
that affected his son; indeed, the son apparently was healthy
enough to work at a fast-food restaurant, as Yao testified.

Regarding the second reason that the IJ (and Board) of-
fered for discrediting him—the omission from his initial writ-
ten statement that family-planning officials had visited him
repeatedly in the months following his wife's 2006 abortion
and searched for him even after he left the country—Yang
contends that any omission is insignificant. But this discrep-
ancy (as the IJ pointed out) strikes at his central reason for

fleeing China and seeking asylum—that he was being pursued by officials seeking to forcibly sterilize him. We have upheld adverse credibility findings based on non-trivial inconsistencies between an asylum applicant's testimony and application. *See Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015); *Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009). The omission from Yang's original written statement of any mention of frequent visits by family-planning officials is a noteworthy inconsistency that the IJ was entitled to rely on.

As for the third reason—regarding his testimony about the degree to which he stayed away from his home to evade family-planning officials (staying away entirely vs. most of the time)—he denies that there was any inconsistency. He maintains that he credibly testified about needing to stay away from home to avoid the officials but encountering them on intermittent occasions when he briefly returned home.

We agree with Yang that this reason is unpersuasive, but on its own this flaw is insufficient to disturb agency's the adverse credibility finding. Viewed in context, Yang's two statements were compatible: he did not testify that he *never* went home; he consistently alluded to returning for brief visits. The IJ's unpersuasive reason notwithstanding, the Board's first two reasons are sufficient to support the adverse credibility finding. An adverse credibility finding can be supported by any non-trivial inconsistencies in the applicant's story, as is the case here. *See Tawuo*, 799 F.3d at 727; *Hassan*, 571 F.3d at 637.[1]

---

[1] Further, Yang does not articulate—and therefore has waived—any challenge to several other reasons that the IJ gave for discrediting Yang's testimony: his inconsistent testimony about whether he was fired by letter

Yang also challenges the IJ's finding that his wife was not credible. She had described being forced to undergo two abortions, the second of which followed a physical struggle with family-planning officials that resulted in her falling down a flight of stairs and being knocked unconscious.

The IJ's assessment of Yao's testimony indeed was flawed, but we accept the Board's determination that her testimony could not cure the defects in Yang's account. Her testimony does not salvage the omissions and inconsistencies that we've already addressed in Yang's testimony and written statements. Nonetheless, two missteps in the IJ's analysis of Yao's credibility need to be pointed out. In discrediting Yao, the IJ relied on questionable assumptions about her demeanor in remarking that she "became increasingly uncomfortable and nervous, and her responsiveness diminished" and that she "struggled to answer questions." First, we've commented on the unreliability of demeanor evidence generally, *see United States v. Pickering*, 794 F.3d 802, 805 (7th Cir. 2015), and the particular difficulty of using such evidence to evaluate the credibility of witnesses from other cultures, *see Djouma v. Gonzales*, 429 F.3d 685, 687 (7th Cir. 2005). And we've criticized an overreliance on findings arising from minor memory lapses when a witness testifies about events from years earlier. *See Kadia v. Gonzales*, 501 F.3d 817, 822 (7th Cir. 2007). Second, the IJ faulted her for not remembering particular circumstances at the hospital that she could not reasonably have known if she was knocked unconscious, as she testified—e.g.,

---

or by phone call, whether he had any savings to draw from when he lost his job, the precise age at which his son's health problems became apparent, and whether the son now holds a job. *See Haichun Liu v. Holder*, 692 F.3d 848, 851 (7th Cir. 2012).

how many stairs she fell down, why she was bleeding from her lower body, having no recollection of the abortion procedure.

Yang also challenges the agency's conclusion that he did not sufficiently corroborate his account under the REAL ID Act, and in particular, that he should have been able to obtain more medical documents about his wife's and son's medical circumstances. Yang asks whether other documentation reasonably would have been available. Although we agree that the IJ and the Board inappropriately faulted Yang for not providing evidence of any forced abortions, *see San Kai Kwok v. Gonzales*, 455 F.3d 766, 771 (7th Cir. 2006); *Zhang v. Gonzales*, 434 F.3d 993, 999–1000 (7th Cir. 2006), the IJ was entitled to expect corroboration of other medical treatment that his wife and son received. When asked whether the hospital had records pertaining to his son, Yang replied that it did, and even acknowledged that he would have been given them had he asked, but he simply didn't think to do so. Nor did Yang think to provide any evidence about the medical condition of his son, whose poor health was the basis for Yang's contention that he might have qualified for an exemption from the one-child policy. More puzzlingly, Yang supplied no evidence to explain why his wife needed to remain in the hospital for as long as three months to treat a fractured arm. Because this evidence was reasonably obtainable, the IJ was entitled to require Yang to provide it to sustain his burden of proof. *See* 8 U.S.C. § 1158(b)(1)(B)(ii).

Finally, Yang contends that the IJ and the Board failed to address his eligibility for withholding of removal and protection under CAT. But as the government correctly points out, Yang waived these challenges because his appeal to the Board

addressed his application for asylum only. *See* 8 C.F.R. § 1003.3(b).

Because substantial evidence supports the IJ's conclusion that Yang was not credible and that he had not sufficiently corroborated his account, we deny the petition for review.